[No. 52595–1. En Banc. October 2, 1986.]

GRANT A. SHERMAN, *Respondent,* v. NEIL MOLONEY, *as Chief of the Washington State Patrol,* ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General,* and *Chip Holcomb, Assistant,* for appellants.

*Gene Godderis,* for respondent.

DURHAM, J.—The Washington State Patrol charged Grant Sherman, a state patrol officer, with use of excessive force in violation of a patrol regulation. A hearing was held before a patrol trial board which determined that Sherman had used excessive force. The chief of the patrol ordered that Sherman be suspended for 15 days without pay. The trial court reversed the order and the patrol appeals. We reverse the trial court and reinstate the chief's order.

Grant Sherman has been an officer of the Washington State Patrol since 1960. On November 22, 1981, at 2:40 a.m., Sherman was parked in his patrol car on the shoulder of the southbound lanes of Interstate 5 near Fife. It was raining and there was water on the road. Sherman noticed a yellow sports car passing him at a high rate of speed. He

began to follow the car down the freeway as it veered from lane to lane. As the car continued across the Puyallup River Bridge, Sherman reported on his radio that he was pacing a vehicle at 80 miles per hour. When the car reached the end of the bridge, Sherman was close behind it. Sherman turned on his red and blue lights and reported the car's license number on his radio. The car stopped abruptly in the beginning of an exit ramp from the freeway and Sherman stopped behind it. The driver's side of each car was protruding into the lane of travel and other vehicles were traveling on the roadway. At this point, the two cars had traveled about 2 miles.

Sherman noticed two people in the car. He walked up to it and told the driver he was driving too fast. Upon Sherman's request, the driver, Stephen Weber, stepped out of the car. Sherman told Weber that it looked like he'd had a lot to drink.[1] After Weber gave Sherman his driver's license, Sherman conducted a patdown search of Weber's upper body. Weber became angry and argumentative, asserting that he had done nothing wrong. Sherman then attempted to lead Weber out of the lane of traffic and behind the patrol car for sobriety tests. Weber refused to follow. Weber then touched Sherman's shoulder, said, "Hold it," and asked Sherman if he was going to arrest him. Sherman responded that he was. Weber asked if he was arresting him for drunk driving. Sherman responded affirmatively and proceeded to inform Weber of his constitutional rights. Weber repeatedly interrupted and questioned Sherman. He protested being arrested and would not go toward the patrol car.[2]

Sherman then grabbed Weber's arm, said, "Okay, let's go," and pulled forward. Weber pulled back and swung at Sherman with his fist. Sherman told him he was now under arrest for resisting arrest. Sherman grabbed him again,

---

[1]Weber's blood alcohol level was measured later that night at 0.17.

[2]Weber had been arrested recently for driving while intoxicated.

Weber pulled back, and Sherman grabbed him with his right hand on his left shoulder. They circled around and when Weber came near the main roadway, Sherman let Weber go. Sherman told Weber, "You're going to have to go with me." Sherman approached and Weber came forward with his fists clenched. Sherman hit Weber with his flashlight. The flashlight, called a Kel–Lite, weighs approximately 2½ pounds and is 16 inches long and about 2½ inches in diameter. The blow did not knock Weber down. Weber yelled at Sherman.

At about this time, Sherman heard the passenger in the sports car struggling to get out. As the passenger approached, Sherman turned to look at him, wondering if he had a weapon or posed any threat. Sherman testified that when he turned back to Stephen Weber, "he [Weber] was right on me again, in a striking attitude, and, this time, I didn't hold back. I hit him hard." Weber went down and he and Sherman wrestled on the ground. Eventually, Sherman put handcuffs on Weber and placed him in the patrol car.

Weber's jaw was broken as a result of the two blows with the Kel–Lite. Regarding the initial blow, Sherman testified, "I didn't try to hit him in the shoulder, or any of the other approved areas, my intention was to give him a good right cross and knock him on his ass . . ." Sherman also stated that at the time, his impression was that Weber would have done anything necessary to get away from him.

After putting Weber in the patrol car, Sherman drove him to the Pierce County Jail. Immediately after they arrived at the jail, Weber appeared cooperative. Sherman removed the handcuffs and took him to the Breathalyzer room. Weber sat down. Suddenly, Weber jumped out of his chair and hit Sherman on the shoulder. Sherman grabbed him and put him back in the chair. In response to the scuffle, a Pierce County corrections officer, Patrick Kelly, arrived at the room and stood in the doorway. After some verbal conflict between Sherman and Weber about whether Weber was actually going to take the Breathalyzer test,

Weber jumped out of the chair and hit Sherman again on the shoulder. Sherman then hit Weber with his fist.[3]

After the events of November 22, Sherman was charged with criminal assault and was acquitted. Weber was convicted of DWI and resisting arrest.

The State Patrol conducted its own investigation into Sherman's actions. It charged Sherman with using excessive force to effect Weber's arrest in violation of a patrol regulation[4] and violating the patrol's policy on the use of nonlethal weapons. Sherman requested and was given an administrative hearing before a trial board, pursuant to RCW 43.43.070. In accordance with this provision, the trial board consisted of two state patrol captains, and one officer of equal rank with Sherman, who were chosen by lot.[5] The chief of the patrol, Neil Moloney, was the presiding officer at the hearing, pursuant to RCW 43.43.090.[6]

---

[3]The evidence is conflicting as to where this blow landed.

[4]Section 2.02(7) of the patrol's General Regulations, Standards and Operations Manual provides: "Officers shall use force only when the exercise of persuasion, advice, and warning is found to be insufficient to enforce the law, and only to an extent necessary to enforce the law or to restore order, and may use only the minimum degree of physical force which is necessary on any particular occasion for achieving their objectives."

[5]RCW 43.43.070 provides:
"Discharge of any officer with probationary status and discharge, demotion, or suspension of any officer with nonprobationary status shall be only for cause, which shall be clearly stated in a written complaint, sworn to by the person preferring the charges, and served upon the officer complained of.

"Upon being so served, any such officer shall be entitled to a public hearing before a trial board consisting of two Washington state patrol officers of the rank of captain, and one officer of equal rank with the officer complained of, who shall be selected by the chief of the Washington state patrol by lot from the roster of the patrol. In the case of complaint by an officer, such officer shall not be a member of the trial board."

[6]At the time of the hearing in this case, RCW 43.43.090 provided:
"At the hearing, the chief of the patrol shall be the presiding officer, and shall make all necessary rulings in the course of the hearing, but shall not be entitled to vote.

"The complainant and the officer complained of may submit evidence, and be represented by counsel, and a full and complete record of the proceedings, and all

The trial board heard 2 days of testimony from witnesses presented by the patrol in support of the charges and witnesses presented by Sherman in his defense. Sherman was represented by counsel. The evidence in support of the charges was presented by a lay department advocate pursuant to patrol procedures. An assistant attorney general was present as counsel for the trial board. During the hearing, the chief made rulings on objections, questioned witnesses, and made various comments. At the conclusion of the hearing, the chief granted Sherman's motion to dismiss the charge of violating the patrol's nonlethal weapons policy, and denied his motion to dismiss the charge of excessive use of force.

After the hearing, the trial board deliberated out of the presence of the chief. It then entered written findings, conclusions, and a recommendation. The board decided that Sherman was justified in using force to effect Weber's arrest, but that the amount of force employed was in excess of the minimum force necessary. The board further determined that Sherman used more force than necessary in striking Weber with his fist at the jail. It concluded that Sherman violated the patrol regulation on the use of force. The board unanimously recommended the imposition of 15 days' suspension without pay. The chief ordered the recommended discipline.

Sherman applied to Thurston County Superior Court for a writ of review for purposes of reviewing the chief's order, pursuant to RCW 43.43.100.[7] The trial court entered an

---

testimony, shall be taken down by a stenographer.

"After hearing, the findings of the trial board shall be submitted to the chief. Such findings shall be final in the case of acquittal. In the event of conviction the chief may determine the proper disciplinary action and declare it by written order served upon the officer complained of."

Since the hearing, the statute has been amended to provide that an administrative law judge rather than the chief shall be the presiding officer. Laws of 1984, ch. 141, § 3, p. 618.

[7]RCW 43.43.100 provides in pertinent part:

"Any officer subjected to disciplinary action may, within ten days after the

order allowing the writ of review. On October 15, 1984, it entered findings and a decision on review. The trial court found that "the trial board's decision was clearly erroneous, contrary to a preponderance of the evidence and the court is left with the definite and firm conviction that a mistake has been committed." Further, it found that the chief of the patrol violated the appearance of fairness doctrine "in presiding over the trial board's hearing, and participating through his acts, questions and comments during the course of the hearing." The court decided Sherman did not receive a fair and impartial hearing. It reversed the chief's disciplinary order.

The state patrol appealed from this decision to the Court of Appeals. The case was then transferred to this court pursuant to RAP 4.3.

■ The first issue is if the trial board erred in deciding Sherman used excessive force. Initially, we must determine the applicable standard for reviewing this decision. RCW 43.43.100 provides in pertinent part: "Any officer subjected to disciplinary action may . . . apply to the superior court of Thurston county for a writ of review to have the reasonableness and lawfulness of the order inquired into and determined." We believe this "reasonableness and lawfulness" standard encompasses the standards for judicial review of agency decisions in contested cases under the administrative procedure act (APA), RCW 34.04.

RCW 34.04.130(6) provides:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the adminis-

service of the order upon the officer, apply to the superior court of Thurston county for a writ of review to have the reasonableness and lawfulness of the order inquired into and determined.

"The superior court shall review the determination of the chief of the Washington state patrol in a summary manner, based upon the record of the hearing before the trial board, and shall render its decision within ninety days, either affirming or reversing the order of the chief, or remanding the matter to the chief for further action. . . ."

trative findings, inferences, conclusions, or decisions are:

    (a) in violation of constitutional provisions; or

    (b) in excess of the statutory authority or jurisdiction of the agency; or

    (c) made upon unlawful procedure; or

    (d) affected by other error of law; or

    (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

    (f) arbitrary or capricious.

The "lawfulness" part of the standard in RCW 43.43.100 is broad enough to include the error of law standards in RCW 34.04.130(6)(a)–(d). The "reasonableness" part of the standard in RCW 43.43.100 may reasonably be interpreted to include the clearly erroneous and arbitrary and capricious tests in RCW 34.04.130(6)(e) and (f). Under the clearly erroneous test, an agency's factual determination may be reversed "'when although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed.'" *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983) (quoting *Ancheta v. Daly*, 77 Wn.2d 255, 259–60, 461 P.2d 531 (1969)). Although the court may not substitute its judgment for the agency's under the clearly erroneous test, it may conduct a broader, more intensive review than under the substantial evidence test. *Sellers*, at 324–25. The clearly erroneous test is a proper standard of review for determining the reasonableness of trial board findings because it allows for judicial deference to the expertise of patrol officers in deciding disciplinary matters, while permitting the court to intervene where the board is definitely mistaken. The arbitrary and capricious test is also applicable to trial board decisions, for courts always have the inherent power to review agency action to the extent of assuring that it is not arbitrary and capricious. *Pierce Cy. Sheriff v. Civil Serv. Comm'n for Sheriff's Employees*, 98 Wn.2d 690, 694, 658 P.2d 648 (1983). In summary, the APA standards of review in RCW 34.04.130(6) are consistent with the "rea-

sonableness and lawfulness" standard in RCW 43.43.100, and are appropriate for reviewing trial board decisions.

On this appeal, we must apply these standards directly to the trial board's decision. An appellate court reviews · administrative decisions on the record of the administrative tribunal, not of the superior court. *Franklin Cy. Sheriff's Office v. Sellers, supra* at 323–24.

The conduct in question actually involved two distinct episodes which must be considered separately: the incident on the freeway and the subsequent events at the jail. The record shows that a number of factors contributed to the danger of the situation at the freeway. Sherman and Weber were in an extremely dangerous position on a dark, wet roadway in the path of vehicles exiting from the freeway. When Sherman made reasonable attempts to arrest Weber, he resisted both physically and verbally. When the unknown passenger from Weber's car approached, Sherman was even more vulnerable. He was required to decide instantly how to bring the situation under control. Considering these circumstances, we cannot conclude that his use of force was excessive. Thus, if Sherman's actions at the freeway had constituted the extent of his use of force, we might decide that he acted reasonably.

Nevertheless, considering the subsequent incident at the jail, we are unable to conclude that the trial board erred in deciding that Sherman used excessive force. However sympathetic we may be with Sherman's frustrations in attempting to deal with Weber, we cannot condone his use of force at the jail. Once Weber was in the Breathalyzer room, the situation was completely different from that on the freeway. Weber was in custody in a secure environment, another officer was present, and there were a number of reasonable alternatives Sherman could have used to subdue Weber. He could have sought the assistance of the other officer, replaced the handcuffs, placed Weber in a holding cell, or employed another means of nonviolent physical restraint. Instead, Sherman hit Weber with his fist. Under the circumstances, this conduct was an excessive use of

force.

In summary, in view of the entire record, we conclude that the trial board's decision that Sherman used excessive force was neither clearly erroneous nor arbitrary and capricious.

The next issue is if Sherman received an unfair hearing before the trial board. Sherman contends that certain aspects of the patrol chief's participation in the hearing rendered it unfair. Under RCW 43.43.090 as it was written at the time of the hearing, "the chief of the patrol shall be the presiding officer [at the hearing before the trial board], and shall make all necessary rulings in the course of the hearing, but shall not be entitled to vote." In the present case, the chief not only made rulings on objections, but also questioned witnesses and made various comments.

Sherman contends that in several instances, the chief questioned witnesses not merely to elicit facts, but in an advocatory fashion which tended to support the patrol's position. Sherman argues that the chief's comments and questions injected bias against him into the hearing. Sherman refers to the following episodes during the hearing:

The chief questioned the emergency room doctor at the hospital where Weber was taken about his experience with suspects injured by police officers.

The chief interrupted questioning by Sherman's counsel of Weber regarding Weber's treatment of his wife. Essentially, the chief stated that he did not see the relevance of the question to the case. However, after counsel explained why he was pursuing this line of questioning, the chief allowed him to proceed.

During the testimony of Officer Stinson, a policeman who had arrested Weber about 9 months before Sherman did, the chief asked several questions about Stinson's experience in arresting persons for traffic violations, including if and how often he had had to strike anybody, and the circumstances of such cases. Sherman's counsel objected to the chief's statements on the grounds he was taking an advocate's position.

The chief asked Officer Kelly about the frequency of violent action in the jail; if it was routine for an officer to strike a prisoner in the face with his fist; if he had ever seen such an incident, and, if so, the circumstances surrounding it; and, if under his training, striking a prisoner was recommended as a last resort.

The chief asked Sergeant Morehead, Sherman's supervisor, if there were alternative actions in a situation such as where Sherman was standing outside the door of Weber's car on the freeway. Sherman's counsel objected to the questioning.

At the beginning of the second day of the hearing, Sherman's counsel made a general objection to advocatory questions by the chief. A lengthy colloquy followed among the chief, Sherman's counsel, the department advocate, and the assistant attorney general. Sherman's counsel indicated that he did not object to the chief asking nonadvocatory questions during the hearing. The chief indicated some frustration with the process and discomfort with his role in the hearing. He stated that he would refrain from advocatory questions. Generally, the discussion appeared to resolve the problem to Sherman's satisfaction. No further objections were made on this basis.[8]

The trial court decided that the chief's conduct at the hearing violated the appearance of fairness doctrine. However, we are unable to find sufficient evidence of actual bias or even probable bias to conclude that Sherman received an unfair hearing.[9]

---

[8]The patrol contends that Sherman may not raise the issue of the chief's alleged bias on appeal because Sherman's counsel did not object adequately to the chief's conduct during the hearing. Although Sherman's counsel did not object at every point where the chief intervened in the proceedings, he did object a number of times to the chief's questions, as noted above. These objections, in combination with the general objection made on the second day of the hearing, were sufficient to preserve the issue for review.

[9]We are aware of the continuing debate on the viability of the appearance of fairness doctrine. *See, e.g., State Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 663 P.2d 457 (1983); *Harris v. Hornbaker*, 98 Wn.2d 650, 658 P.2d 1219

Sherman asserts that the chief's conduct indicated that he had made up his mind about the issues and that he was personally biased against Sherman. However, there is no evidence that the chief ever expressed an opinion on the issues before the trial board. Furthermore, while the record as a whole indicates that the chief was uncertain about the proper procedures, it does not show that he was particularly prejudiced against Sherman. The chief granted and overruled objections by both parties at various times during the hearing. On the second day of the hearing, after Sherman's counsel had objected to the chief questioning witnesses as an advocate, the chief confined his participation to objective questions and rulings on objections. The chief did not ask any questions of Sherman during the hearing. In summary, although the chief's conduct during the hearing may not have been exemplary, it does not show bias against Sherman.

Sherman also contends that since the trial board members were subordinates of the chief, the chief's conduct during the hearing was likely to affect the board's decision. He argues that because of this hierarchical relationship between the chief and the trial board members, they were jeopardized if they made findings favorable to Sherman. We are unconvinced by this argument. In absence of specific evidence, it is far too speculative to conclude that the board members' employment relationship with the chief itself prevented them from deciding the case fairly.

In summary, there is no evidence that the chief was actually biased against Sherman. Furthermore, we believe that a reasonably prudent and disinterested observer of the trial board hearing would conclude that Sherman received a fair and impartial hearing. Therefore, the hearing was fair both in substance and appearance.

In conclusion, we hold that the disciplinary order sus-

---

(1983). However, we need not resolve this matter presently, for regardless of how the inquiry into the fairness of quasi–judicial proceedings is labeled, the result would be the same in this case.

pending Sherman for 15 days without pay was both reasonable and lawful. The trial court is reversed and the order is reinstated.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

Reconsideration denied November 14, 1986.