[No. 22304-0-II.    Division Two.    May 14, 1999.]
LANE W. JACKSTADT, *Appellant*, v. WASHINGTON STATE PATROL, *Respondent*.

502

BRIDGEWATER, C.J., dissents by separate opinion.

*Edward C. Harper* and *Leo Peter Shishmanian*, of *Olmstead Gibbs & Harper,* for appellant.

*Christine O. Gregoire, Attorney General*, and *Carol A. Smith-Merkulov, Assistant*, for respondent.

MORGAN, J. — RCW 43.43.090 designates the chief of the Washington State Patrol (WSP) as the reviewing officer in a trial board proceeding. The question presented here is whether the chief may disqualify and substitute the assistant chief, a person of similar though not equal rank, when the chief has a conflict of interest. The answer is yes.

To discharge a trooper, the WSP convenes "a public hearing before a trial board consisting of two Washington state patrol officers of the rank of captain, and one officer of equal rank with the officer complained of."[1] "[A]n administrative law judge . . . shall be the presiding officer, and shall make all necessary rulings in the course of the hearing, but shall not be entitled to vote."[2] "After hearing, the findings of the trial board shall be submitted to the chief."[3] Although the "findings shall be final if the charges are not sustained," "[i]n the event the charges are sustained the chief may determine the proper disciplinary action."[4] The trooper may seek review in the Thurston County Superior Court, and then again in this court.[5]

In August 1994, a citizen complained about an incident involving Trooper Lane W. Jackstadt. Sergeant Holman, Jackstadt's supervisor, received the complaint. A short time later, the WSP commenced an internal investigation.

[1] RCW 43.43.070.

[2] RCW 43.43.090.

[3] *Id.*

[4] *Id.*

[5] RCW 43.43.100; RCW 34.05.526.

On April 5, 1995, before the investigation was complete, Annette Sandberg became chief of the WSP. Bruce Bjork became or remained assistant chief. Before becoming chief, Sandberg was a lawyer for the Washington State Patrol Troopers Association, and she represented Jackstadt in a disciplinary proceeding not related to this one.

On April 19, 1995, Sandberg sent an interoffice memo to all district, division, and section commanders of the WSP. The memo stated in part:

> Prior to being appointed Chief on April 5, 1995, I represented some individual troopers from the Washington State Patrol Troopers Association. I withdrew from this representative capacity prior to my appointment and have had no further contact or involvement on these cases with either the individuals or the attorney who has taken over the cases.
>
> In order to eliminate any concerns of a conflict of interest regarding the specific cases I have handled, I am taking the following step:
>
> I have delegated my decision-making authority on the specific cases referred to on the attached list to Assistant Chief Bruce Bjork. He will be the principal contact person and will handle any inquiries or questions regarding the procedures for these cases and any other matters relating to resolution or settlement. Under no circumstances should any employee have any contact or communication with me concerning these specific cases. All inquiries should go to Assistant Chief Bjork. Once the cases are resolved, Assistant Chief Bjork will inform me of the final disposition only.[6]

The attached list included Jackstadt's earlier case.

On August 29, 1995, while the investigation was still ongoing, a representative of the Troopers Association wrote Jackstadt to advise of its progress. The letter stated in part:

> The matter is now pending in the Chief's Office awaiting a decision as to what level of discipline is appropriate. The Patrol

---

[6]Clerk's Papers at 117.

has reiterated to me that because of a prior involvement in your case, Chief Sandberg has not been a participant in the discussions concerning the disposition of your case.[7]

In the fall of 1995, the internal investigators concluded that the citizen complaint was meritorious. On December 11, 1995, Jackstadt's attorney requested a trial board proceeding. He also said:

. . . [T]he Trial Board procedures as well as the RCW indicate that the "Chief" shall render the final decision. We are expecting that Chief Sandberg will follow the procedure and statute in this case.[8]

A month later, on January 16, 1996, Chief Sandberg sent another memo to Assistant Chief Bjork. She stated:

Given my previous role in dealing with Trooper Lane Jackstadt as the lawyer for the WSP Troopers Association, I hereby delegate the decision making authority on his upcoming trial board to you.

As mentioned in my previous [memo] dated April 19, 1995, I have been screened from this matter. This [memo] is just to clarify that you will consider the recommendations of the trial board and will ultimately be the sole decision maker in this case as per RCW 43.43.090.[9]

On February 1, 1996, Jackstadt formally notified the State that he intended to call Sandberg as a witness in the trial board proceeding. He described her expected testimony as follows:

Sandberg will testify regarding her involvement as attorney to Jackstadt. Her testimony will include conversations that she had with Trooper Jackstadt immediately following his being advised of a complaint by Sergeant Holman. She will also testify regarding the political pressure she was aware of from

[7]Clerk's Papers at 89.

[8]*Id.* at 104.

[9]*Id.* at 120.

various Legislators. She will also testify regarding conversations that she had with members of the Patrol and any other criminal justice agency. She will be asked to testify regarding any conversations she has had regarding the Jackstadt matter with anyone, excluding legal counsel.[10]

In a later sworn affidavit, he similarly described her expected testimony as follows:

16. At the Trial Board, I wanted to call Chief Annette Sandberg as a witness on my behalf. She had represented me when she was an attorney working with [the Troopers' Association].

17. Chief Sandberg and I discussed in confidence numerous issues with regard to this case. I believed that she was advising and representing me as my attorney. I know that Chief Sandberg was aware of confidential information that I provided to her, and she knew of the political pressures being brought to bear on the State Patrol.[11]

On February 12, 1996, the presiding administrative law judge excluded Sandberg's expected testimony from the trial board proceeding. Jackstadt does not assign error to that ruling, and we do not consider its propriety.

The trial board convened on February 20 and ended on February 26. In written but undated findings, the Trial Board upheld the charges and recommended termination.

Following the board's decision, the parties sparred over the role, if any, that Sandberg should play in the process of review. The WSP asked Jackstadt to waive Sandberg's conflict of interest, or agree that Bjork could act in her place. Refusing to accept either alternative, Jackstadt asserted that Sandberg could neither act nor decline to act during the process of review; he proposed instead that the parties abandon the trial board's findings in favor of a new

---

[10]Administrative Record at 41.

[11]Clerk's Papers at 61.

arbitration proceeding.[12] The WSP declined, and Bjork proceeded to act in Sandberg's stead.

On April 11, 1996, Bjork terminated Jackstadt's employment. On April 22, 1996, Jackstadt appealed to the Thurston County Superior Court. That court affirmed, and this appeal followed.

■ At the outset, we focus exclusively on RCW 43.43. As noted already, RCW 43.43.090 provides that "the findings of the trial board shall be submitted to the chief." It further provides that "[i]n the event the charges are sustained the chief may determine the proper disciplinary action." RCW 43.43.020 provides that "the chief shall appoint a sufficient number of competent persons to act as Washington state patrol officers, may remove them for cause, as provided in this chapter, and shall make promotional appointments, determine their compensation, and define their rank and duties, as hereinafter provided."

Jackstadt argues that these statutes *prohibit* the chief, even when the chief has a conflict of interest, from disqualifying and substituting the assistant chief. As Jackstadt puts it in his brief:

> RCW 43.43.020 provides that the chief and only the chief . . . is authorized to appoint and remove state patrol officers. No disqualification or delegation is provided therein. RCW 43.43.100 [sic] also vests the chief alone with the power to determine what is a proper disciplinary action after a trial board. No disqualification or delegation is provided therein either.[13]

Jackstadt concludes that disqualification and delegation are prohibited.

---

[12]*See* Clerk's Papers at 114-15. In a letter dated March 12, 1996, counsel for Jackstadt stated that "we are not going to . . . waive any challenge regarding Chief Sandberg on the basis of conflict of interest, bias, prejudice, or any other theory not already mentioned." In the same letter, counsel stated that "my client is not going to request or agree that Chief Sandberg disqualify herself." In a brief filed on appeal, counsel states that Jackstadt "has maintained from the beginning that he wants [Sandberg] to make the final decision regarding termination of his employment." Reply Br. at 14.

[13]Br. of Appellant at 6 (underlining in original); *see also* Reply Br. at 1.

The argument confuses omission with prohibition. Jackstadt is correct in saying that RCW 43.43.090 and 43.43.020 are silent on what a chief should do when the chief has a conflict of interest. Jackstadt goes on to presume, however, that this omission is also a prohibition—i.e., that it prohibits anyone other than the chief from being the reviewing officer, even when the chief has a conflict of interest. Nothing in RCW 43.43 says that the chief "and only the chief" may remove a trooper, or that the chief is *prohibited* from disqualifying and substituting the assistant chief when the chief has a conflict of interest. Jackstadt *implies* those provisions, and we should adopt his implications only if the Legislature intended them.

If we expand our focus to include not just RCW 43.43, but other statutes and principles also, we see that the Legislature did not intend the prohibition for which Jackstadt contends. To explain, we address the Administrative Procedure Act (APA) first, and other concepts thereafter.

## I

The APA is codified as RCW 34.05. It contemplates that an administrative proceeding may involve both a presiding officer and a reviewing officer. The presiding officer oversees the hearing and initial order,[14] while the reviewing officer reviews the initial order.[15] The reviewing officer may be the agency head.[16]

The APA allows for the disqualification and replacement of a reviewing officer. RCW 34.05.464(3) provides that RCW 34.05.425 and 34.05.455 apply to a reviewing officer "to the same extent that it is applicable to presiding officers." RCW 34.05.425(3) provides that a presiding officer "is subject to disqualification for bias, prejudice, interest, or any other cause provided in this chapter or for which a judge is disqualified." RCW 34.05.455(1) and (2) generally provide,

---

[14]*See* RCW 34.05.425(1).

[15]RCW 34.05.464(4).

[16]*Id.*

subject to exceptions not pertinent here, that "a presiding officer may not communicate" with certain persons "regarding any issue in the proceeding." RCW 34.05.425(7) provides that "[i]f . . . an individual . . . becomes unavailable as a result of disqualification or any other reason, the substitute must be appointed by the appropriate appointing authority." RCW 34.05.425(8) provides that "[a]ny action taken by a duly appointed substitute . . . is as effective as if taken by the unavailable individual."

Jackstadt correctly points out that RCW 34.05.425, 34.05.455, and 34.05.464 do not apply "to the extent they are inconsistent with any provisions of chapter 43.43."[17] In our view, however, RCW 34.05.425, 34.05.455, and 34.05.464 address what to do when the chief has a conflict of interest. RCW 43.43 is silent on that matter. Thus, RCW 34.05.425, 34.05.455, and 34.05.464 fill the void in a way that supplements, but is not inconsistent with, RCW 43.43.

Because the APA applies here, Sandberg had discretion to disqualify herself and appoint Bjork in her stead. As just seen, RCW 34.05.425(3) and RCW 34.05.464(3) provide that a reviewing officer may disqualify for any reason "for which a judge is disqualified."[18] Judges are governed by the Code of Judicial Conduct (CJC), which is applied by using "an objective test that assumes that 'a reasonable person knows and understands all the relevant facts.' "[19] Canon 3(D) of the CJC provides that "[j]udges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances in which . . . the judge has a personal bias or prejudice concerning a party"; the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding"; or "the judge previously served as a lawyer or was a material witness in the matter in controversy."

[17]RCW 34.05.030(2)(e).

[18]*Accord, Hill v. Department of Labor & Indus.*, 90 Wn.2d 276, 279-80, 580 P.2d 636 (1978) (common-law rules on conflict of interest are same for administrative tribunals as for judges).

[19]*Sherman v. State*, 128 Wn.2d 164, 205-06, 905 P.2d 355 (1995).

Canon 3(A)(4) of the CJC provides generally that a judge may "neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding." Here, according to Jackstadt himself, he and Sandberg conversed "immediately following his being advised of a complaint by Sergeant Holman."[20] He and she "discussed in confidence numerous issues with regard to this case," and she "was aware of confidential information that [he] provided to her." He "believed that she was advising and representing [him] as [his] attorney,"[21] and she also had represented him in a prior case. He wanted to call her as a witness before the trial board, so he must have thought she had "personal knowledge of disputed evidentiary facts concerning the proceeding."[22] A judge caught in this situation would have had discretion to substitute a different judge, and we think Sandberg had discretion to substitute the assistant chief.

## II

We confirm this application of the APA by referring to other concepts. They include (A) legislative intent, (B) subdelegation, and (C) implied power.

## A

■■ Given that RCW 43.43.090 does not address the situation in which a chief has a conflict of interest, we should reach a result that effectuates the Legislature's intent in enacting that statute.[23] One intent, obviously, was to be fair to both the WSP and the involved trooper. Another intent, equally obviously, was to give an *appearance* of fairness to the WSP, the involved trooper, and the public

---

[20]Administrative Record at 41.

[21]Clerk's Papers at 61.

[22]CJC Canon 3(D).

[23]*See Bennett v. Hardy*, 113 Wn.2d 912, 928, 784 P.2d 1258 (1990); *Reid v. King County*, 35 Wn. App. 720, 722, 669 P.2d 502 (1983).

at large. These intents would be disserved—indeed, subverted—if we were to construe the statute as requiring the chief to act quasi-judicially notwithstanding a conflict of interest.[24] They are furthered, however, if the chief can disqualify herself and substitute the assistant chief. Thus, our application of the APA is consistent with legislative intent.

## B

■ "Subdelegation" means "the transmission of authority from the heads of agencies to subordinates."[25] Its usual purpose is to free agency heads to "concentrate their attention upon the larger and more important questions of policy and practice."[26] A narrower purpose, however, is that present here: to allow for a fair quasi-adjudicative proceeding when an agency head who otherwise would be the reviewing officer is subject to a conflict of interest.

■ Initially, subdelegation was viewed with suspicion by the courts.[27] By the 1960s it was allowed more free-

[24]This view is not inconsistent with the language of RCW 43.43.090 itself. The statute provides that the findings of the trial board "shall" be submitted to the chief. It does not provide that the chief "shall" make the decision. On the contrary, it uses the passive voice to state that an unnamed person will sustain or overturn the findings. Thereafter, the chief "may" determine the proper disciplinary action. We footnote these observations because we doubt that they mean much; throughout RCW 43.43, the legislature seems to have used both "shall" and "may" somewhat haphazardly. At a minimum, however, the legislature's choice of words is not inconsistent with the chief's having discretion to disqualify herself and substitute the assistant chief when faced with a conflict of interest.

[25]1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 2.7, at 85 (3d ed. 1994).

[26]Id.

[27]E.g. Runkle v. United States, 122 U.S. 543, 7 S. Ct. 1141, 30 L. Ed. 1167 (1887) (statute requiring presidential approval for dismissal of officer from the army after court martial meant that President had to exercise his personal judgment); Cudahy Packing Co. v. Holland, 315 U.S. 357, 315 U.S. 788, 62 S. Ct. 651, 86 L. Ed. 895 (1942) (Wage-Hour Administrator could not delegate the power to sign and issue a subpoena to a regional director). One manifestation of this suspicion was the proposition that ministerial duties, but not discretionary ones, could be subdelegated. Interestingly, Professor Davis commented on Washington's application of that proposition as follows:

   Of special importance is recognition of the frequent unreliability of the much repeated generalization that ministerial but not discretionary powers

ly,[28] and by 1971 it was so well settled that the leading commentator said, "It has almost disappeared from litigation."[29] By 1994, it had become "a mainstay of government operation," and "[p]arties [were] no longer challenging normal subdelegations."[30] Today, according to the leading commentators, "[t]he courts permit subdelegation when Congress has authorized subdelegation or when the statute is silent on the matter."[31] Here, where RCW 43.43.090 is silent on the matter of subdelegation, but we permit subdelegation by applying the APA, our analysis is consistent with this long-term national trend.

## C

██ Lastly, "[a]dministrative agencies have those powers expressly granted to them and those necessarily implied

---

may be delegated. The generalization is sometimes followed and sometimes not. It is often violated by the very court that pays lip service to it. For instance, the Supreme Court of the State of Washington declares: "Where . . . legislation . . . confides legislative or discretionary functions in particular officials or boards, such functions may not be delegated to others." The court goes on to find that duties delegated to a consulting engineer "are important, and they will require the exercise of judgment, but since they are administrative in character, there is no violation of the principle . . ." Even more, a group of public utility districts delegated management powers to an executive board, for "joint operation, management, improvement and extension of the joint system." The duties of the executive board were far from ministerial, involving about as important discretionary power as each public utility district possessed. The court in sustaining it forgot the principle it had laid down earlier in the opinion: 'Where, as here, the operation is to be the joint responsibility of several quasi-municipal corporations, the designation of a management board seems especially necessary. It is, therefore, an arrangement clearly within the contemplation of the enabling legislation . . .'

1 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE, *Subdelegation of Power* § 9.06, at 638-39 (1958) (quoting *Roehl v. Public Utility District No. 1*, 43 Wn.2d 214, 240-41, 261 P.2d 92 (1953)).

[28]*E.g. United States Health Club, Inc. v. Major,* 292 F.2d 665 (3d Cir.), *cert. denied,* 368 U.S. 896 (1961); *United States Bio-Genics Corp. v. Christenberry,* 173 F. Supp. 645 (S.D.N.Y. 1959), *aff'd* 278 F.2d 561 (2d Cir. 1960); *Parker v. Summerfield,* 265 F.2d 359 (D.C. Cir. 1959).

[29]KENNETH CULP DAVIS, ADMINISTRATIVE LAW TEXT 215 (3d ed. 1972).

[30]DAVIS & PIERCE, *supra* § 2.7, at 87.

[31]*Id.* at 88.

from their statutory delegation of authority."[32] "When a power is granted to an agency, 'everything lawful and necessary to the effectual execution of the power' is also granted by implication of law."[33] "[I]mplied authority is found where an agency is charged with a specific duty, but the means of accomplishing that duty are not set forth by the Legislature."[34] These principles apply here, where the Legislature that enacted RCW 43.43.090 granted the chief express power to review trial board proceedings, but failed to address the situation in which the chief has a conflict of interest.

Because of Sandberg's apparent conflict of interest, she had discretion to disqualify herself and substitute the assistant chief, a person of similar though not equal rank.[35] She did not abuse that discretion, and we affirm the judgment below.

ARMSTRONG, J., concurs.

BRIDGEWATER, C.J., dissenting — The majority uses judicial interpretation to construe RCW 43.43 to permit the Chief of the Washington State Patrol (WSP) to delegate her duty as "reviewing officer" of the trial board decision and her duty to take appropriate disciplinary action. I agree that it would be best if the reviewing officer were free from bias when making decisions regarding punishment, but giving the power to delegate to the Chief is a legislative function, not a judicial one. I therefore respectfully dissent.

---

[32]*Tuerk v. Department of Licensing*, 123 Wn.2d 120, 124-25, 864 P.2d 1382 (1994).

[33]*Id.* at 125.

[34]*Id.*

[35]We have no occasion to consider whether a chief would be *required* to disqualify under the circumstances present here. Because Jackstadt is objecting to Sandberg's disqualification, and not to her refusal to disqualify, the question before us is whether she was *permitted* to disqualify (i.e., whether she had discretion to do so); it is not whether she was *required* to disqualify. Nor do we have occasion to consider whether a chief would have discretion to disqualify under circumstances not involving a conflict of interest, or to subdelegate to a person other than the assistant chief.

When reviewing a statute, our function is to ascertain the Legislature's intent. The most basic principle with regard to judicial interpretation is that a statute is not subject to judicial interpretation where the language is plain and unambiguous. *See State v. Kazeck*, 90 Wn. App. 830, 832, 953 P.2d 832 (1998). RCW 43.43 requires the Chief and only the Chief to determine disciplinary action and therefore does not permit delegation of the Chief's authority. It is unambiguous. Thus, judicial interpretation should not be used to determine the Legislature's intent.

The majority uses the Administrative Procedure Act (APA), RCW 34.05, to bolster their argument that we can imply the authority to delegate into RCW 43.43. But I disagree with their assertion that the APA applies to this case—it does not. The APA itself makes it clear that its provisions cannot apply here. RCW 34.05.030(2)(e) states that the APA does not apply wherever RCW 43.43 is inconsistent with the APA. The majority does not see an inconsistency between the APA and RCW 43.43. But RCW 43.43 requires the Chief to personally act as the reviewing officer and does not provide for delegation, while the APA addresses instances where there is a conflict of interest and allows delegation. That is an inconsistency. Thus, the inconsistent APA provisions cannot prevail over RCW 43.43. In addition, RCW 34.05.464(2) states that reviewing officers "may appoint a person to review initial orders and to prepare and enter final agency orders" only when it is "authorized by law." RCW 43.43 does not authorize the Chief to appoint a person in her stead to review initial orders. Thus, the APA itself provides that APA provisions do not apply to this situation and cannot be used to justify the Chief's recusal and delegation.

Furthermore, if the Legislature had intended to allow recusal and delegation, it would have provided for it. The Legislature knows how to provide for delegation of authority by agency heads—RCW 28A.300.120 (Superintendent of Public Instruction); RCW 41.05.021 (Administrator, State Health Care Authority); RCW 43.20A.110 (Secretary, Department of Social and Health Services); RCW 43.21A-

.090 (Director, Department of Ecology); RCW 43.24.024 (Director, Department of Licensing); RCW 43.30.170 (Supervisor, Department of Natural Resources); RCW 43.41.060 (Director, Office of Financial Management); RCW 43.51.061 (Parks and Recreation Commission); RCW 43.60A.060 (Director, Department of Veterans Affairs); RCW 43.70.040 (Secretary, Department of Health); RCW 43.300.040 (Commission, Department of Fish and Wildlife); RCW 43.330.040 (Director, Department of Community, Trade, and Economic Development); RCW 72.09.050 (Secretary, Department of Corrections); and RCW 82.01.080 (Director, Department of Revenue). RCW 43.17.040 gives the directors of several state agencies the power to delegate their authority to a chief assistant director in case of their absence, disability, or vacancy in office. The WSP is conspicuously omitted from the list of agencies. The maxim "expressio unius est exclusio alterius" tells us that where a statute specifically designates the things upon which it operates, an inference exists that all things omitted were intentionally omitted. Thus, since the list of state agencies that have the power to delegate omits the WSP, we can infer that it was intentional and that the WSP chief does not have the authority. The Legislature did not grant the authority to the Chief of the WSP the power to delegate and there is no basis to infer that it intended to do so.

Furthermore, without express legislative action, the Chief does not have the power to delegate. Administrative agencies have only the express powers granted to them and those necessarily implied from the statutory grant of authority. *Tuerk v. Department of Licensing*, 123 Wn.2d 120, 124-25, 864 P.2d 1382 (1994). We know that the authority to delegate this function was not expressly granted from the Legislature. But, is it necessarily implied? The majority answers "yes," but I think the answer must be "no" if the decision can be made under any circumstance by the Chief. The Chief argues that for her to decide the case would violate the appearance of fairness doctrine. But the doctrine of necessity would allow the Chief to act.

It is established by the great weight of authority that where

a public officer, or an administrative board, or a legislative body—such as the city council—is given exclusive jurisdiction to conduct a hearing and determine whether an individual should or should not be removed from office, and no alternate or substitute is provided, disqualification will not be permitted to destroy the only tribunal with power in the premises.

*Kennett v. Levine*, 50 Wn.2d 212, 219, 310 P.2d 244 (1957). The doctrine of necessity is also set forth in RCW 42.36.090, the statute pertaining to appearance of fairness. RCW 42.36.090 allows a person to continue to participate as a member of a decision-making body, even where there is a conflict of interest, providing that he or she declares the conflict prior to acting. Thus, her disqualification must yield to necessity. Accordingly, because the Chief could have made a decision based upon necessity, the power to delegate is not a "necessarily implied" power.

*Sherman v. Moloney*, 106 Wn.2d 873, 725 P.2d 966 (1986), applied the appearance of fairness doctrine to the Chief of the WSP. In that case, the Chief sat as the presiding officer of the trial board. Sherman claimed that there was an appearance of fairness violation and that the Chief was biased against him. The Supreme Court found neither bias nor probable bias and let the decision stand. While this case was pending, the Legislature considered RCW 43.43 and made the following changes: (1) it removed the Chief from the trial board and replaced the Chief with an administrative law judge as a nonvoting, presiding officer; and (2) it amended the APA to clarify that when the statutes pertaining to the State Patrol are inconsistent with the APA, the State Patrol statutes will prevail. The Legislature left the Chief as the reviewing officer with the power to determine discipline. The Legislature did not provide a safety valve of a delegable authority in case of absence or disability. The Legislature had the opportunity to provide for delegation in case of bias and did not provide that mechanism.

The Legislature may have good reason to distinguish the WSP from other agencies in this respect—it is unique in state government. The Chief appoints all patrol officers,

promotes them, determines their compensation, makes final decisions regarding their disability issues, and defines their rank and duties. This agency is exempt from any inconsistent provisions of the APA. If we judicially provide for delegation in a most important area such as this—punishment—then "delegation" will exist in any area the Chief wishes. Whether this is appropriate is not a judicial issue, it is a legislative problem that deserves study and a decision based on policy.

Therefore, I respectfully disagree with my colleagues as to whether we can judicially interpret that the Legislature meant to include delegation. I do not disagree that it should be provided. But, this is a legislative matter, not a judicial one. The case should be remanded back to the WSP for review and decision by the Chief.