137 P.3d 78 (2006)
NATIONSCAPITAL MORTGAGE CORP., Jamie Chisick; Michael Buff; Kevin Kraus and Darin Williams, Appellants,
v.
STATE of Washington DEPARTMENT OF FINANCIAL INSTITUTIONS and Scott Johnson, Respondents.
No. 32851-8-II.
Court of Appeals of Washington, Division 2.
June 20, 2006.
*82 Scott Johnson, Kirkland, WA, pro se.
Mario James Madden, Russillo Schwabe Williamson & Wyatt PC, Jennifer Lynn Campbell, Schwabe Williamson & Wyatt PC, Seattle, WA, Craig Gerard, Gary Roberts, Schwabe Williamson & Wyatt PC, Portland, OR, for Appellants.
Charles Edward Clark, Office of the Attorney General, Olympia, WA, for Respondent.

PART PUBLISHED OPINION
HOUGHTON, J.
¶ 1 Following a 10-month investigation of consumer complaints that Nationscapital Corporation, a mortgage broker, misrepresented loan terms and conditions, the Department of Financial Institutions (DFI)[1] brought an enforcement action against Nationscapital Corporation and certain of its officers and employees, alleging numerous violations of the Mortgage Broker Practices Act (Act), chapter 19.146 RCW. An administrative law judge (ALJ) found that Nationscapital Corporation committed most of the alleged violations. The ALJ also found the Nationscapital Corporation president personally liable for some violations. With some revisions, a reviewing officer adopted the ALJ's findings and conclusions and issued a final order assessing fines totaling $457,575 and restitution of $712,527 to 120 borrowers.
¶ 2 Nationscapital Corporation and its president and officers (Nationscapital) appeal, *83 arguing that DFI (1) exceeded its statutory authority by investigating Nationscapital and bringing an enforcement action beyond that necessary to resolve the specific consumer complaints filed with DFI; (2) erroneously ordered restitution to 120 borrowers who did not initiate a complaint; (3) violated the appearance of fairness doctrine and/or its due process rights by permitting a biased agency head to appoint the reviewing officer; (4) erred in holding the corporation's president, Jamie Chisick, personally liable for fines and restitution; (5) acted arbitrarily and capriciously in banning one of its officers, Michael Buff, from the mortgage broker business for five years; and (6) entered findings unsupported by substantial evidence. Finding no error, we affirm.[2]

FACTS

FACTS RELEVANT TO INVESTIGATIVE AUTHORITY
¶ 3 DFI granted Nationscapital a mortgage broker's license in May 1995. During the next two years, DFI received seven consumer complaints about Nationscapital's loan terms and conditions. Following DFI's procedures, DFI asked Nationscapital to provide a written response to the consumer complaints. In each instance, Nationscapital stated that it had fully disclosed the loan terms and conditions and that the consumers could have, but did not, choose to rescind the loan. Again, following its procedures, DFI closed the first five complaints after consumers failed to indicate their dissatisfaction with Nationscapital's response.
¶ 4 In April 1997, John and Carol Salick filed a complaint with DFI, alleging that Nationscapital misrepresented their loan terms and conditions. In May 1997, Nevada Prater also filed a complaint, alleging that Nationscapital misrepresented her loan terms and conditions. In addition, Prater filed a class action lawsuit in federal district court.
¶ 5 The Salicks claimed that Nationscapital told them their loan costs would not exceed $1,500 for an $88,000 refinancing loan, but their actual costs were over $13,000. DFI reviewed copies of the loan documents the Salicks provided. The Truth in Lending Disclosure Statement (TIL) stated: "These are FEES NOT paid by the Borrower . . . BROKERS FEE . . . $8,805.00." Ex. 67 at 2. Under that statement is a line-item broker-origination fee of $8,805. Based on the TIL and verbal representations Nationscapital employees made, the Salicks incorrectly believed they were not responsible for the $8,805 broker-origination fee.
¶ 6 Alarmed by the Salick loan documents, DFI investigators suspected that the documents typified a broader practice of misrepresenting loan terms and conditions. In June 1997, DFI began investigating the consumer complaints. On June 23, 1997, DFI issued a demand for production of records for "All files for loans originated in the State of Washington as requested by the Director's agents" and "All trust account records for the client's trust account (specific records and documents to be identified by the Directors agents)." Ex. 15.
¶ 7 Three DFI employees, including Chuck Cross, appeared unannounced at the Bellevue office and served the demand. Two Nationscapital employees were present, Steve Willis and Scott Johnson. Willis is a licensed broker who managed the Bellevue office. When the investigators asked to see Nationscapital's business records, Willis told them that all records were maintained at the corporate headquarters in California. The Act requires a mortgage broker to maintain its records in Washington.
¶ 8 Cross asked Willis to explain Nationscapital's process for soliciting loans in Washington. Willis said Nationscapital used a "predictive dialer" from a location in California, which leaves a recorded message on a consumer's answering machine. Ex. 16 at 4. Also, Nationscapital relied on calls placed by California telemarketers. And Nationscapital received referrals from the First Alliance Mortgage Corporation (FAMC), a consumer loan company owed by Jamie Chisick's father. Willis further stated that the corporate headquarters would send a package of documents to the Bellevue office and that he *84 or another Nationscapital employee would visit the consumer's home to obtain signatures on loan application documents. The Bellevue office then forwarded the documents to California for processing, including the preparation of closing documents by an escrow company Jamie Chisick owned. Finally, a Bellevue office employee would visit the consumer's home again to obtain signatures on the closing documents. The Act prohibits loan solicitation and processing by unlicensed out-of-state mortgage brokers.
¶ 9 Willis also told Cross he relied on Nationscapital's training manuals, which instructed him how to behave when he visited consumers' homes to obtain signatures on loan documents. Cross asked to see the manuals. After some resistance, Willis gave the investigators three manuals from an office shelf. These manuals instructed Nationscapital employees to avoid answering direct questions about loan terms and conditions, trained them in evasive techniques, and advised them to make false representations to consumers. The Act prohibits mortgage brokers from misleading consumers about loan terms and conditions.
¶ 10 Cross then asked Willis whether Nationscapital had a trust account in Washington. Willis said he did not know. The Act requires mortgage brokers to comply with detailed trust account regulations.
¶ 11 Cross also questioned Willis and Johnson about the Salicks' allegations. In particular, he showed Willis the Salicks' loan disclosure documents. Willis and Johnson appeared confused by the apparently inconsistent disclosure statements. Cross asked Willis whether the Salick transaction was typical. Willis said that it was. Willis also said that the Bellevue office handled about 200 loan transactions annually.
¶ 12 In August 1997, DFI ordered Nationscapital to cease and desist business as a Washington mortgage broker. Additionally, DFI ordered Nationscapital to return its business records to Washington and to make them available for DFI's review. Nationscapital sought and obtained a temporary order to stay the agency action, which permitted Nationscapital to continue doing business but ordered it to refrain from specific unlawful behaviors, including making false and misleading statements, falsely notarizing documents, failing to make timely disclosure of lending information, and maintaining its records outside of Washington. The court also ordered Nationscapital to make its records available for DFI's review and to file required documents with DFI documenting compliance with trust account regulations.
¶ 13 On September 25, 1997, DFI issued a third demand to Nationscapital for records production. In addition to the information previously requested, the demand requested records of General Acceptance Mortgage Corporation (GAMC),[3] which conducted business as a mortgage broker in Washington for a year before changing its name to Nationscapital. DFI also requested a list of Washington consumers solicited by either GAMC or Nationscapital; a list of all borrowers for whom either company originated a loan in Washington; and details of any disputes with consumers, together with associated correspondence and settlement agreements.

FACTS RELATED TO JAMIE CHISICK
¶ 14 Jamie Chisick owned Nationscapital and served as its president and secretary. He oversaw Nationscapital's operations, including telemarketing and loan processing activities conducted out of the California headquarters. Chisick, together with Buff, prepared the telemarketing and document signer manuals used to solicit Washington consumers. He also supervised training activities at the California headquarters. And Chisick hired and supervised Willis, who ran the Washington office. In several instances, he personally dealt with consumer complaints about loans originated in Washington.

FACTS RELEVANT TO APPOINTMENT OF REVIEWING OFFICER
¶ 15 During the investigation period, John Bley served as DFI's director and Mark *85 Thomson served as deputy director. Thomson participated in all major decisions concerning the investigation of Nationscapital. He also participated in defining the scope of the investigation and in preparing the statement of charges against Nationscapital. Nationscapital deposed him and called him as a witness during the administrative hearing.
¶ 16 By the time the ALJ entered his initial order, Bley had left the agency and Thomson served as DFI's acting director. Before resigning, Bley appointed Dennis Dellwo, an attorney, as the reviewing officer. Because of his involvement in the investigation, Thomson disqualified himself from serving as the reviewing officer. But he confirmed Bley's appointment of Dellwo as the reviewing officer.
¶ 17 Dellwo notified the parties in writing that he had served as a state representative and as a member of the House Financial Institutions Committee at the time the legislature amended the Act in 1993 and 1994. He stated that he had supported the amendments.
¶ 18 Nationscapital did not respond to Dellwo's letter. But it asked Dellwo to disqualify himself on other grounds, arguing that Thomson should not be allowed to appoint the reviewing officer because he was himself disqualified. Nationscapital alleged:
"Nations feels that what has happened is that the most biased person in the state chose a reviewing officer who he believes shares that bias. Nations believes that Thomson's bias against Nations is so strong that without question, Thomson would not choose a person to serve as a reviewing officer unless Thomson felt strongly that the reviewing officer he chose shared his biases."
Administrative Record (AR) at 733.
¶ 19 Nationscapital further requested discovery in order to determine any prior communications or prior relationship between Thomson and Dellwo and the basis for Thomson's selection of Dellwo. Thomson declined to respond to Nationscapital's request for production of documents. Dellwo refused to disqualify himself.
¶ 20 Both Nationscapital and DFI petitioned for review of the ALJ's initial order. The reviewing officer reviewed the ALJ's findings and conclusions and issued a 24-page final order. In it, the reviewing officer responds to each of the exceptions Nationscapital and DFI raised. In most instances, the reviewing officer affirmed the ALJ, concluding that substantial evidence in the record supported the ALJ's findings. In some instances, the reviewing officer agreed with Nationscapital that the ALJ's findings and conclusions should be modified.
¶ 21 For instance, the ALJ found that Nationscapital failed to produce records DFI demanded. The reviewing officer modified the finding to reflect that Nationscapital grounded its refusal on DFI's unwillingness to enter a confidentiality agreement. The reviewing officer also amended another factual finding related to Nationscapital's failure to produce records to reflect that, during a particular period, it was closed in recognition of the Jewish holidays.
¶ 22 The reviewing officer ruled in favor of Nationscapital on the issue of its liability for fines related to its failure to cooperate with investigators for 166 days, beginning August 18, 1997. After concluding that the ALJ inadequately described the basis for the fines, the reviewing officer eliminated them from the final order.
¶ 23 Both Nationscapital and DFI objected to the ALJ's conclusion that Chisick was personally liable for one type of disclosure violation but not personally liable for another. The reviewing officer agreed that the conclusions were inconsistent, but he found that the record evidence supported a determination that Chisick was personally liable for both types of violations.
¶ 24 Nationscapital appeals.

ANALYSIS

STANDARD OF REVIEW
¶ 25 We review de novo the interpretation of a statute. Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 9, 43 P.3d 4 (2002). Our fundamental objective in statutory interpretation is to give effect to the legislature's intent. Campbell & Gwinn, *86 146 Wash.2d at 9-10, 43 P.3d 4. If a statute's meaning is plain on its face, then we must give effect to that plain meaning as an expression of legislative intent. State ex rel. Citizens Against Tolls (CAT) v. Murphy, 151 Wash.2d 226, 242, 88 P.3d 375 (2004). We discern plain meaning not only from the provision in question but also from closely related statutes and the underlying legislative purposes. Wash. Pub. Ports Ass'n v. Dep't of Revenue, 148 Wash.2d 637, 647, 62 P.3d 462 (2003). If a statute is susceptible to more than one reasonable interpretation, after this inquiry, the statute is ambiguous and we may resort to additional canons of statutory construction or legislative history. Campbell & Gwinn, 146 Wash.2d at 12, 43 P.3d 4.
¶ 26 We should give effect to all statutory language; we consider statutory provisions in relation to each other, harmonizing them to ensure proper construction. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 560, 14 P.3d 133 (2000). We avoid construing a statute in a manner that results in unlikely, absurd, or strained consequences. Glaubach v. Regence BlueShield, 149 Wash.2d 827, 833, 74 P.3d 115 (2003). Instead, we favor an interpretation consistent with the spirit or purpose of the enactment over a literal reading that renders the statute ineffective. Glaubach, 149 Wash.2d at 833, 74 P.3d 115. Furthermore, we uphold an agency's interpretation of the statutes it administers if it reflects a plausible construction of the statute's language, not contrary to legislative intent. Seatoma Convalescent Ctr. v. Dep't of Soc. & Health Servs., 82 Wash.App. 495, 518, 919 P.2d 602 (1996), review denied, 130 Wash.2d 1023, 930 P.2d 1230 (1997).
¶ 27 The Administrative Procedure Act (APA), RCW 34.05.570, governs judicial review of an agency order. We may grant relief from an agency order only if the party challenging the order demonstrates its invalidity based on the reasons specifically set forth in the statute. RCW 34.05.570(1)(a),(b), (3). Nationscapital asserts invalidity of the DFI order because it: (1) violates the constitution, (2) exceeds the agency's statutory authority, (3) is based on an erroneous interpretation or application of the law, (4) is not supported by substantial evidence, (5) involves an improperly denied motion for disqualification, (6) is inconsistent with an agency rule, and (7) is arbitrary and capricious. RCW 34.05.570(3)(a),(b),(d),(e),(g), (h), and (i).
¶ 28 We apply a substantial evidence standard to an agency's findings of fact but we review de novo its conclusions of law. Heidgerken v. Dep't of Natural Res., 99 Wash.App. 380, 384, 993 P.2d 934, review denied, 141 Wash.2d 1015, 10 P.3d 1071 (2000). We review an agency's interpretation of statutes and implementing regulations under the error of law standard, which permits us to substitute our judgment for the agency's. Aponte v. Dep't of Soc. & Health Servs., 92 Wash.App. 604, 616-17, 965 P.2d 626 (1998), review denied, 137 Wash.2d 1028, 980 P.2d 1280 (1999). But when an administrative agency administers a special field of law and possesses quasi-judicial functions because of its expertise in that field, we accord substantial weight to the agency's interpretation of the governing statutes and legislative intent. Overton v. Econ. Assistance Auth., 96 Wash.2d 552, 555, 637 P.2d 652 (1981) (deferring to the Department of Revenue's interpretation of tax exemptions for manufacturers). Furthermore, we give substantial deference to agency views when it bases its determination on factual matters, especially factual matters that are complex, technical, and close to the heart of the agency's expertise. Hillis v. Dep't of Ecology, 131 Wash.2d 373, 396, 932 P.2d 139 (1997) (deferring to the Department of Ecology's determination that watershed assessments are an appropriate means of evaluating water permits).
¶ 29 An agency action is arbitrary and capricious where willful and unreasoning and taken without regard to the attending facts or circumstances. Wash. Indep. Tel. Ass'n v. Wash. Util. & Transp. Comm'n, 148 Wash.2d 887, 905, 64 P.3d 606 (2003). Where room for two opinions exists, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous. Wash. Indep. Tel. Ass'n, 148 Wash.2d at 905, 64 P.3d 606.
*87 ¶ 30 The substantial evidence standard is highly deferential to the agency fact finder. ARCO Prods. Co. v. Wash. Utils. & Transp. Comm'n, 125 Wash.2d 805, 812, 888 P.2d 728 (1995). The evidence must be of a sufficient quantum to persuade a fairminded person of the truth of a declared premise. In re Electric Lightwave, Inc., 123 Wash.2d 530, 542-43, 869 P.2d 1045 (1994). We will not weigh the evidence or substitute our judgment regarding witness credibility for that of the agency. Affordable Cabs, Inc. v. Employment Sec., 124 Wash.App. 361, 367, 101 P.3d 440 (2004). And we consider unchallenged findings of fact as verities on appeal. Davis v. Dep't of Labor & Indus., 94 Wash.2d 119, 123, 615 P.2d 1279 (1980).

DFI's STATUTORY AUTHORITY TO INVESTIGATE NATIONSCAPITAL
¶ 31 Nationscapital contends that DFI exceeded its statutory authority by conducting an overly broad investigation. It argues that DFI may only investigate a mortgage brokerage to the extent necessary to evaluate and resolve specific consumer complaints. In its view, when DFI investigates a complaint, it may not broadly inquire into a mortgage broker's activities in order to discover violations that no consumer complained about.
¶ 32 DFI responds that the Act confers broad investigative authority on the agency and that Nationscapital's narrow construction contravenes both the plain and unambiguous language of the statute and the legislative purpose as evidenced in closely related statutes and legislative history.
¶ 33 The Act sets forth DFI's investigative powers as follows:

For the purposes of investigating complaints arising under this chapter, the director may at any time, either personally or by a designee, examine the business, including but not limited to the books, accounts, records, and files used therein, of every licensee and of every person engaged in the business of mortgage brokering, whether such a person shall act or claim to act under or without the authority of this chapter. For that purpose the director and designated representatives shall have access during regular business hours to the offices and places of business, books, accounts, papers, records, files, safes, and vaults of all such persons. The director or designated person may direct or order the attendance of and examine under oath all persons whose testimony may be required about the loans or the business or subject matter of any such examination or investigation, and may direct or order such person to produce books, accounts, records, files, and any other documents the director or designated person deems relevant to the inquiry. . . .

Once during the first two years of licensing, the director may visit, either personally or by designee, the licensee's place or places of business to conduct a compliance examination. The director may examine, either personally or by designee, a sample of the licensee's loan files, interview the licensee or other designated employee or independent contractor, and undertake such other activities as necessary to ensure that the licensee is in compliance with the provisions of this chapter. . . . After this one visit within the two-year period subsequent to issuance of a license, the director or a designee may visit the licensee's place or places of business only to ensure that corrective action has been taken or to investigate a complaint.

RCW 19.146.235 (emphasis added).
¶ 34 Nationscapital asserts that the statute permits a relatively broad investigation for purposes of a compliance examination only once during a mortgage broker's first two years of operation and, after that, DFI may investigate a licensee only to the extent necessary to resolve specific consumer complaints. Thus, it argues, DFI should have limited its investigation to those records related to the Salick and Prater loan transactions instead of demanding production of all Nationscapital's loan files and other documents. Nationscapital contends that DFI lacked authority to: (1) investigate all the consumer loans Nationscapital originated in Washington, (2) order restitution to 120 borrowers who never filed a complaint, (3) assess penalties and fines for violations unrelated to the complaints received, or (4) hold it *88 responsible for the costs of an overly broad investigation.
¶ 35 Nationscapital's construction does not comport with the statute's plain meaning that we discern through the legislative purposes underlying the Act and closely related statutes. The legislature declared that the residential mortgage broker business "substantially affects the public interest." RCW 19.146.005. The legislature's stated purpose in regulating mortgage brokers is "to promote honesty and fair dealing with citizens and to preserve public confidence in the lending and real estate community." RCW 19.146.005. The legislature granted DFI's director "the power and broad administrative discretion to administer and interpret" the Act to fulfill that purpose. RCW 19.146.223. Further, the legislature declared that any violation of the Act is a per se unfair or deceptive act or practice and an unfair method of competition for purposes of the Consumer Protection Act (CPA), chapter 19.86 RCW.
¶ 36 Nationscapital's construction of RCW 19.146.235 would not further the legislature's purpose of promoting honesty and fair dealing or preserving public confidence in the lending and real estate community. Under Nationscapital's interpretation, DFI would have to turn a blind eye to violations where no consumer specifically complained about them and address only those complaints brought by individual consumers. Such a narrow focus on individual complaints is contrary to the legislative declaration that the business of residential mortgage brokers affects the public interest and that violations of the Act implicate the CPA.
¶ 37 An unfair or deceptive act or practice is one that has a capacity to deceive a substantial portion of the public. Sing v. John L. Scott, Inc., 134 Wash.2d 24, 30, 948 P.2d 816 (1997). By declaring violations of the Act to be per se unfair or deceptive acts or practices, the legislature indicated its concern with deterring deceptive conduct before injury occurs. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 785, 719 P.2d 531 (1986). And following our case law on the CPA, a public interest declaration suggests that the legislature is not primarily concerned with remedying individual harm but, rather, with avoiding the repetition of harmful conduct or activity affecting the broader public. See Hangman Ridge, 105 Wash.2d at 790, 719 P.2d 531 ("it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest"). Nationscapital's interpretation would hamper DFI from detecting violations that affect more than the individual, complaining consumer, and, thus, it is contrary to the legislature's stated intent to promote public confidence in the industry.
¶ 38 DFI maintains that the statute grants it broad discretion to thoroughly examine a mortgage broker's business activities when investigating a complaint and that it acted within this range of discretion when it investigated and pursued an enforcement action against Nationscapital. We agree.
¶ 39 DFI's construction of the statute promotes the legislative intent. When the legislature granted DFI broad powers to examine a mortgage broker's business activities "[f]or the purposes of investigating complaints," it did not intend to limit DFI's review to those documents relevant only to specific consumer complaints but authorized the agency to broadly examine the business to the extent the director "deems relevant to the inquiry." RCW 19.146.235. The Act defines "investigation" as "an examination undertaken for the purpose of detection of violations of this chapter." RCW 19.146.010(9). Given the Act's public interest orientation, the most reasonable interpretation of the statute is that the legislature intended for DFI to attempt to detect not only past violations affecting an individual complaining consumer when it investigates particular complaints, but also recurrent and ongoing violations likely to have affected, and continuing to affect, other members of the public.
¶ 40 Nationscapital asserts that the statute represents a balancing of interests between "necessary regulation and unnecessary intrusions into the licensee's business." Appellant's Br. at 25. It argues that the legislature intended to prohibit DFI from *89 embarking on a "witch hunt." Appellant's Br. at 25.
¶ 41 The legislature authorized DFI to promulgate administrative rules only after seeking advice from the mortgage brokerage commission. RCW 19.146.225. The mortgage brokerage commission includes five members, at least three of whom must be licensed mortgage brokers. RCW 19.146.280(1), (2). Professional organizations representing mortgage brokers are entitled to recommend appointees to the commission. RCW 19.146.280(2). The commission advises the director of the needs of the mortgage brokerage profession. RCW 19.146.280(5).
¶ 42 But the legislature's underlying concern in giving mortgage brokers a voice in regulation was not to protect mortgage brokers, but to make regulation more effective and streamlined:
(2) The legislature further finds it in the public interest to strengthen the regulation, supervision, and examination of business entities furnishing financial services to the people of this state and that this can be accomplished by streamlining and focusing regulation to reduce costs, increase effectiveness, and foster efficiency by eliminating requirements that are not necessary for the protection of the public.
(3) The provisions of chapter 256, Laws of 1994 should not be construed to limit the ability of the director of financial institutions to implement prudent regulation, prevent unsafe, unsound, and fraudulent practices, and undertake necessary enforcement actions to protect the public and promote the public interest.

RCW 43.320.007 (emphasis added).
¶ 43 Nationscapital correctly notes that the statutory schemes governing investigations of consumer lenders, escrow agents, and check cashers and sellers are broader than that governing mortgage brokers. In each instance, the legislature does not condition the agency's investigative powers on the receipt of a complaint. See RCW 31.04.145, RCW 18.44.420, RCW 31.45.100. But Nationscapital overstates the difference.
¶ 44 The sole difference is that, in the case of the other financial services providers, the agency need not await a triggering event before investigating; whereas, following a two-year probation period, DFI may not investigate mortgage brokers absent a consumer complaint. Except for that difference, the legislature confers broad authority on DFI to investigate mortgage brokers using substantially the same language as in the statutes governing the other regulated activities that Nationscapital cites for contrast. Importantly, the Act does not expressly limit DFI to an investigation of only the specific allegations raised in the consumer complaint. Rather, a more reasonable interpretation is that the receipt of a complaint triggers DFI's broad investigative powers. Once it has notice of potential violations, DFI has broad discretion to determine the scope of the investigation. This interpretation comports with the legislative intent analyzed above.
¶ 45 Contrary to Nationscapital's suggestion, in this case DFI did not seize on a consumer complaint as a pretext to launch an otherwise prohibited wide-ranging and unnecessarily intrusive investigation. Rather, the scope of the investigation was commensurate with the extent and gravity of Nationscapital's suspected violations. Before its investigation, DFI received seven consumer complaints, all alleging similar misconduct by Nationscapital. Although DFI closed the first five of those complaints without taking action, together they suggested a pattern of misconduct. Nationscapital takes an overly technical view of the law that would bar DFI from considering past complaints merely because DFI previously declined to pursue an enforcement action. DFI could properly take the prior complaints into account in determining whether, and to what extent, it should investigate Nationscapital in response to subsequent complaints.
¶ 46 In reviewing the Salick complaint, DFI discovered that Nationscapital used a preprinted form that deceptively suggested that a borrower was not responsible for broker fees. Given the probability that a preprinted form would be used in other loans originated by Nationscapital, DFI reasonably could have considered records for all loans originated in Washington as "relevant to the inquiry" into the Salick complaint. DFI *90 need not ignore violations affecting other consumers merely because they did not initiate a complaint. Thus, DFI's initial demand for production of records did not exceed the scope of its investigative authority.
¶ 47 Moreover, the troubling responses that Willis gave to DFI's initial inquiries at Nationscapital's Bellevue office in June 1997, further justified a broad investigation into Nationscapital's business practices. Willis told DFI investigators that none of Nationscapital's loan documents was kept in-state, as required by law. RCW 19.146.060(3). Willis revealed that unlicensed brokers solicited and processed most, if not all, loans, also contrary to state law. RCW 19.146.200(1).
¶ 48 Willis said he did not know if Nationscapital had a trust account to handle client funds, a further violation of state law. RCW 19.146.050. Willis gave DFI investigators copies of sales manuals that evidenced deceptive conduct by Nationscapital employees when dealing with Washington borrowers, contrary to state law. RCW 19.146.0201(1), (2), (3), (6), and (7). And Willis admitted that the Salick loan transaction typified the loans originated in Washington. In sum, DFI acted within the scope of its statutory authority when it broadened its investigation to take account of the information it learned during its initial inquiries.

RESTITUTION
¶ 49 Nationscapital further contends that DFI erred when it ordered $712,586.13 restitution to 120 borrowers. Nationscapital challenges the restitution order on the grounds that: (1) DFI waived restitution, (2) it improperly relied on hearsay, (3) substantial evidence does not support the order, (4) the order lacks adequate findings and conclusions, and (5) the order is based on an erroneous interpretation of the disclosure requirements.
¶ 50 The Act prohibits mortgage brokers from collecting any broker fees without adequate disclosure. RCW 19.146.030(4). A mortgage broker must provide an initial written disclosure of all fees and costs within three days of receiving a loan application. RCW 19.146.030(1). A mortgage broker may not collect fees in excess of those initially disclosed unless the broker provides a written explanation of the fee increase at least three days before closing. RCW 19.146.030(4). DFI may order restitution to borrowers harmed by violations of this rule. RCW 19.146.220(2)(d)(ii).
¶ 51 DFI reviewed 371 loan files and sought restitution for 122 borrowers. Nationscapital did not provide a written explanation for fee increases for any of the loans. Thus, DFI could have prevented Nationscapital from collecting broker's fees in any instance where fees increased. Instead, where Nationscapital disclosed a fee increase at least three days before closing, DFI did not order restitution despite the lack of a written explanation for the increase.
¶ 52 Where Nationscapital provided an initial disclosure of fees but did not timely disclose a fee increase, DFI ordered restitution amounting to the difference between the initial disclosure and the fee increase ("low overcharge"). AR at 433. DFI prevented Nationscapital from collecting any broker fees in only those cases where Nationscapital failed to make any disclosure before closing ("high overcharge"). AR at 433.
¶ 53 In explaining DFI's position on restitution, Chuck Cross testified:
I want to point out that not in a single transaction or not in any of these transactions that we reviewed here did Nations ever give an explanation in writing, as required, of the increase in these charges. And the department's been very lenient on that and hasn't considered that. If we were to take that into consideration, we would find every instance, regardless of redisclosure, where Nations increased its fees, that they were not in compliance and the lowest amounts should be refunded. So we've taken a substantially lenient position in favor of Nations during this analysis.
Report of Proceedings (RP) at 632-33.
¶ 54 At the hearing, DFI submitted two binders of documents in support of its restitution request. The binders include a summary of DFI's analysis and calculations, examples of how DFI calculated restitution, a list of 122 borrowers and the amount of *91 restitution sought for each, and supporting documentation on each borrower's loan transaction.
¶ 55 For each borrower, DFI presented a one-page spreadsheet detailing the fees disclosed and those actually collected, the date of disclosure (when known), the amount of restitution sought, and the reason for the restitution order. The spreadsheet includes a heading: "The following factors control this analysis." Ex. 66. The factors include: "No GFE [Good Faith Estimate] found in loan file; No signed/dated GFE in loan file; Borrower indicates no receipt of GFE; Signed GFE dated as of closing; signed GFE at least 3 days before closing, no redisclosure; Redisclosed GFE signed at date of closing or less than 3 days before closing." Ex. 66. DFI checked one or more of the factors for each borrower to indicate the reason (and thus the relevant formula) for restitution in each case. DFI sought $717,586.13 total restitution.
¶ 56 Nationscapital argued that, in some cases, it satisfied the redisclosure requirements by providing a revised GFE by the lender and/or a statement titled, Itemization of Amount Financed. The ALJ rejected the argument because neither form satisfied the statutory requirement of a written explanation for the increase in broker's fees.
¶ 57 The ALJ ordered restitution in the amount DFI sought, less $5,058.94 related to the Prater complaint, which settled before the initial order. The reviewing officer affirmed the restitution order.

Waiver
¶ 58 Nationscapital first contends that DFI waived its right to penalize Nationscapital for its failure to provide a written explanation for fee increases. It asserts that, in litigating the restitution issue, it relied on Cross's testimony that DFI would overlook Nationscapital's failure to provide a written explanation. Thus, at the hearing, Nationscapital argued that the lender's GFE and other documents satisfied the statutory disclosure requirements even though the documents did not provide a written explanation of fee increases.
¶ 59 A waiver is an intentional and voluntary relinquishment of a known right. Pub. Util. Dist. No. 1 v. Wash. Pub. Power Supply Sys., 104 Wash.2d 353, 365, 705 P.2d 1195, 713 P.2d 1109 (1985). Waiver can be inferred only from conduct inconsistent with any intention other than such relinquishment. Pub. Util. Dist., 104 Wash.2d at 365, 705 P.2d 1195.
¶ 60 The record does not support an inference that DFI waived its right to hold Nationscapital responsible for failing to provide a written explanation of fee increases. From the statement of charges, through the prehearing briefing, testimony and evidence submitted at the hearing, and posthearing briefing, DFI consistently maintained that Nationscapital violated the law and owed restitution for failing to comply with the written disclosure requirements of RCW 19.146.030. In seeking restitution, DFI overlooked the failure to provide a written explanation of fee increases only in those cases where Nationscapital disclosed the fee increase at least three days before closing. But where Nationscapital failed to timely disclose the fee increase, DFI consistently held it responsible for the lack of written explanation.
¶ 61 At the hearing, Nationscapital argued that the lender's GFE and an Itemization of Amount Financed documents satisfied those requirements. But DFI vigorously contested that assertion on the ground that the documents did not provide the required explanation for increases in broker's fees. And DFI's documentary support for the restitution order clearly expresses DFI's position that Nationscapital owes restitution in those cases where it failed to provide a written disclosure of fee increases at least three days before closing. Nationscapital's suggestion that DFI's change in position during the litigation caught it by surprise lacks credibility.

Consumer Questionnaire
¶ 62 Nationscapital further claims that the restitution order is invalid to the extent DFI relied on the results of a consumer questionnaire as substantive evidence of Nationscapital's disclosure violations. Nationscapital *92 asserts the questionnaire contains inadmissible hearsay and otherwise is unreliable.
¶ 63 Several months into the investigation, DFI sent a questionnaire to nearly 400 consumers asking about their experiences with Nationscapital. DFI asked a series of questions to help determine the extent and scope of suspected violations. In particular, DFI wanted to know whether, and to what extent, Nationscapital applied the techniques described in the telemarketing manual and document signer manual in its dealings with Washington consumers. A total of 137 consumers responded. DFI offered the questionnaires, together with a summary of consumer responses, into evidence.
¶ 64 Nationscapital objected, arguing that the questionnaires were unreliable because they informed consumers that DFI suspected Nationscapital of violations and alerted consumers to the possibility of financial recovery for reported violations. Nationscapital also argued that DFI failed to establish an adequate foundation for the questionnaires' reliability.
¶ 65 DFI responded that it did not offer the questionnaires as substantive evidence. DFI said it intended to provide independent proof for each of the alleged violations "[t]o the extent the department's requesting restitution for any individual consumer, the department is not relying on results of the survey for that purpose." RP at 319.
¶ 66 The ALJ overruled Nationscapital's objection, ruling that its concerns went to the weight and credibility of the evidence rather than the evidence's admissibility.
¶ 67 DFI included the consumer questionnaire as supporting documentation for more than a third of the borrowers for whom it sought restitution. DFI used the questionnaire as evidence that the borrower did not receive a GFE. But DFI also presented independent evidence to support its restitution order. In each instance, the loan file either did not contain a signed GFE or the borrowers signed the GFE the same day as closing.
¶ 68 Nationscapital recognizes that hearsay may be admissible in administrative proceedings,[4] but it argues that "reasonably prudent persons would not rely on biased, non-scientific surveys to contradict contrary documentary evidence." Appellant's Br. at 38. The contrary documentary evidence that Nationscapital refers to are unsigned disclosure documents in the loan files. In instances where the consumer indicated on the questionnaire that he or she did not receive a GFE, but the loan file contained an unsigned and/or undated GFE, the ALJ believed the consumer. Contrary to Nationscapital's position, no reason exists to believe that the unsigned documents in the loan file should carry more weight than the consumers' responses.
¶ 69 Even without the questionnaires, DFI presented sufficient proof that Nationscapital failed to satisfy the disclosure requirements. The ALJ correctly ruled that Nationscapital's objections went to the weight and credibility of the questionnaires, not their admissibility. The ALJ could properly consider them, together with the other documentation DFI presented in determining whether Nationscapital satisfied the disclosure requirements.

Hearsay / RCW 34.05.461(4)
¶ 70 Nationscapital further objects to using the consumer questionnaire on the ground that its use unduly abridged Nationscapital's ability to confront witnesses and rebut evidence, in violation of RCW 34.05.461(4), which provides in part:
Findings shall be based on the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs. Findings may be based on such evidence even if it would be inadmissible in a civil trial. However, the presiding officer shall not base a finding exclusively on such inadmissible evidence unless the presiding officer determines that doing so would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence. The basis for this determination shall appear in the order.
*93 ¶ 71 Nationscapital's argument lacks merit. By the rule's plain terms, whether a party's opportunity to confront witnesses has been unduly abridged becomes an issue only when the presiding officer relies "exclusively" on evidence that would be inadmissible in a civil trial. Here, the ALJ did not exclusively rely on the consumer questionnaire in ordering restitution. Rather, the questionnaire results were but one part of the documentary evidence presented to demonstrate the disclosure violations. In fact, the restitution order would stand even absent the survey results because of Nationscapital's failure to provide an adequate written explanation of the fee increases and the absence of signed, dated disclosure documents in the loan files. We hold that the ALJ did not violate RCW 34.05.461(4) by considering the results of the consumer questionnaires.

Adequacy of Findings and Conclusions
¶ 72 Nationscapital next argues that the findings and conclusions do not support the restitution order, contrary to RCW 34.05.461(3), which provides in relevant part:
Initial and final orders shall include a statement of findings and conclusions, and the reasons and basis therefor, on all the material issues of fact, law, or discretion presented on the record, including the remedy or sanction. . . . Any findings based substantially on credibility of evidence or demeanor of witnesses shall be so identified. Findings set forth in language that is essentially a repetition or paraphrase of the relevant provision of law shall be accompanied by a concise and explicit statement of the underlying evidence of record to support the findings.
In evaluating whether findings and conclusions satisfy the statute, "[a]dequacy, not eloquence, is the test." US West Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n, 86 Wash.App. 719, 731, 937 P.2d 1326 (1997) ("the statute does not require that findings and conclusions contain an extensive analysis").
¶ 73 The ALJ entered several findings related to the restitution order and underlying disclosure violations. The ALJ (1) found that many borrowers failed to receive any disclosures at all; (2) summarized the testimony of numerous consumers who stated they received inaccurate or misleading disclosures; (3) found that Nationscapital never provided a written explanation for fee increases; (4) found that neither the lender's GFE nor the Itemization of Amount Financed document satisfied the disclosure requirements because the documents failed to explain the fee increases; (5) explained DFI's methodology for calculating restitution; and (6) found that Chisick had the ultimate authority on fees charged to consumers.
¶ 74 The ALJ entered six conclusions of law on restitution. The ALJ explained why it rejected Nationscapital's arguments: DFI lacked authority to order restitution; the lender's GFE and Itemization of Amount Financed statements satisfy the disclosure requirements; no redisclosure is required so long as there is no overall increase in the total closing costs; and Chisick had no responsibility for setting fees in Washington.
¶ 75 The ALJ agreed with DFI that "Nations overcharged Washington borrowers and violated RCW 19.146.030(4) as set forth in Exhibit 66." AR at 657 (conclusion of law 42). The ALJ concluded that
[t]he evidence established that Nations did not meet the fee disclosure requirements of this statute and is liable for restitution in the amount of $717,586.13 as set out in Exhibit 66 [minus the amount of the Prater complaint]. Thus, Nations will be ordered to pay restitution to the remaining 120 injured borrowers in the amount of $712,527.19.
AR at 668 (conclusion of law 44).
¶ 76 Nationscapital argues that the ALJ's failure to enter separate findings related to each borrower make the findings and conclusions inadequate. In its view, the ALJ should have explained why, in each particular instance, the ALJ agreed with DFI's evidence and reasoning and why he rejected Nationscapital's. Nationscapital's argument lacks merit.
¶ 77 The statute does not compel an "extensive analysis," let alone the exhaustive one that Nationscapital demands. See U.S. West, *94 86 Wash.App. at 731, 937 P.2d 1326. Nationscapital repeatedly asserted that it satisfied disclosure requirements by providing a lender's GFE, Itemization of Amount Financed and/or unsigned or undated disclosure documents. The ALJ reasonably summarized his reasons for rejecting Nationscapital's arguments.
¶ 78 Nationscapital refers to the loan transactions of five borrowers as typical of the ALJ's inadequate findings and conclusions. Nationscapital identifies these borrowers by their surnames.
¶ 79 Harwick. DFI requested restitution for Barbara Harwick based on Nationscapital's failure to disclose an increase in broker's fees at least three days before closing. In support, DFI presented Harwick's loan documents and noted the absence of a signed and dated GFE in the loan file. To rebut DFI's claim, Nationscapital presented a disclosure statement with a typed date of August 8, 1995, but signed by Harwick on the closing date, August 12, 1995. On appeal, Nationscapital asserts the ALJ erred in ordering restitution because the evidence shows timely disclosure of the fee increase.
¶ 80 Livingston. DFI requested restitution for Richard and Sheri Bruner-Livingston based on Nationscapital's failure to disclose an increase in broker's fees at least three days before closing. In support, DFI presented the Livingstons' loan documents and noted the absence of a signed and dated GFE in the loan file. To rebut DFI's claim, Nationscapital presented a disclosure statement with a typed date of June 22, 1995, but signed by the Livingstons on the closing date, July 3, 1995.
¶ 81 Clogston. DFI requested full restitution for Jeannette Clogston based on Nationscapital's failure to give any disclosure before closing. In support, DFI presented disclosure documents signed on the closing date. In rebuttal, Nationscapital offered unsigned disclosure documents.
¶ 82 McGlone. DFI requested full restitution for Ronald and Sherry McGlone based on Nationscapital's failure to give any disclosure before closing. In rebuttal, Nationscapital presented disclosure documents with a typed date of August 8, but signed on the closing date, August 12, 1995. Contrary to Nationscapital's assertion, the documents do not show that "Nations Federal Expressed the revised disclosure to the borrower on August 8, and that the borrower received it on August 9." Appellant's Br. at 41.
¶ 83 Ihrig. DFI requested full restitution for Robert Ihrig and Susan Antrim-Ihrig based on Nationscapital's failure to give any disclosure before closing. In support, DFI presented disclosure documents signed on the closing date. Additionally, DFI submitted a multi-page complaint the Ihrigs filed, in which they state that they failed in repeated attempts to obtain clear, accurate information on their loan terms and conditions. In rebuttal, Nationscapital offered a disclosure document with a typewritten date of August 17, 1995, but signed and dated by the Ihrigs on the closing date.
¶ 84 Nationscapital complains that the restitution order is inadequate because the ALJ failed to explain why he considered DFI's evidence and reasoning more persuasive in each of the above instances. There are two possible basis for the ALJ's ruling. The ALJ ruled that Nationscapital violated the disclosure requirements by failing to give a written explanation for the fee increase. This provides a sufficient bases for the restitution order, regardless of whether the ALJ accepted Nationscapital's contrary evidence on the disclosure timing. The ALJ also could have reasonably rejected the evidence Nationscapital presented because the documents were either unsigned or undated, or there was a discrepancy between the typewritten date and the signature date. The ALJ need not have extensively and exhaustively detailed each instance in which it found DFI's documentary evidence more credible than Nationscapital's in order to satisfy the statutory requirements for findings and conclusions.
¶ 85 We hold that the ALJ's findings and conclusions adequately support the restitution order.

Interpretation of Disclosure Requirements
¶ 86 Nationscapital argues that it satisfied the disclosure requirements when it *95 redisclosed fee increases through either an Itemization of Amount Financed document or a lender's GFE.
¶ 87 The statute requires brokers to provide "a clear written explanation of the fee and the reason for charging a fee exceeding that which was previously disclosed." RCW 19.146.030(4) (emphasis added). In its briefing, Nationscapital quotes the first part of that sentence and omits the latter.
¶ 88 We agree with DFI, the ALJ, and the reviewing officer that neither the lender's GFE nor the Itemization of Amount Financed satisfies the statutory requirements. Most obviously, neither document explains the reason for a fee increase. Further, unlike a revised broker's GFE, neither form provides a breakdown of the type of fee charged to consumers. In contrast, the form DFI favored permits a consumer to easily compare initial with redisclosed fees and to discern fee increases that inure to the broker's benefit.
¶ 89 The ALJ did not err in concluding that the Itemization of Amount Financed and/or lender's GFE fails to satisfy the statutory disclosure requirements.

APPOINTMENT OF REVIEWING OFFICER
¶ 90 Nationscapital contends that DFI denied it a fair hearing by permitting a biased agency head, either Bley or Thomson, to appoint the reviewing officer. In its view, the APA permits only an unbiased official to appoint a substitute reviewing officer. Alternately, it argues that either the appearance of fairness doctrine or constitutional due process compels the appointment of a reviewing officer by a neutral third party. Nationscapital further contends that DFI erred by refusing discovery on the issue of the reviewing officer's bias.

Interpretation of APA provisions on Appointment of Reviewing Officer
¶ 91 Under the APA, anyone serving as either a presiding or reviewing officer in an adjudicative proceeding "is subject to disqualification for bias, prejudice, interest, or any other cause provided in this chapter or for which a judge is disqualified." RCW 34.05.425(3), .464(3). A person who has served as an investigator, prosecutor, or advocate may not serve as a presiding officer in the same proceeding. RCW 34.05.458(1). But the mere participation in a preliminary determination of probable cause does not provide a ground for disqualification. RCW 34.05-.458(2). When a person is disqualified from serving as a presiding or reviewing officer, "the substitute must be appointed by the appropriate appointing authority." RCW 34.05.425(7) (emphasis added). An agency head is the appointing authority for a reviewing officer. RCW 34.05.464.
¶ 92 Thomson did not merely participate in the determination of probable cause, but was a lead investigator who had a role in "all major decisions" pertaining to the investigation. RP at 4542. Thus, he was statutorily disqualified from serving as the reviewing officer.
¶ 93 Under the APA, when an agency head is disqualified from serving as reviewing officer, he or she may appoint a substitute. Jackstadt v. Wash. State Patrol, 96 Wash.App. 501, 508, 976 P.2d 190 (1999), review denied, 1999 Wash. LEXIS 806. Jackstadt involved a Washington State Patrol (WSP) chief who had represented a trooper in a disciplinary proceeding when she worked as a lawyer for the Troopers Association. The statute governing WSP disciplinary proceedings designated her as the reviewing officer in a later proceeding involving the same trooper. She recused herself based on a conflict of interest and appointed her own substitute. The trooper appealed, arguing that the chief lacked statutory authority to delegate her responsibilities as reviewing officer. Jackstadt, 96 Wash.App. at 507, 976 P.2d 190.
¶ 94 On review, we held that the APA provisions for the disqualification and replacement of a reviewing officer supplement the specific statutory scheme pertaining to WSP disciplinary matters. Jackstadt, 96 Wash.App. at 509, 976 P.2d 190. We concluded that a WSP chief disqualified from reviewing a disciplinary proceeding because of a conflict of interest may appoint a substitute *96 reviewing officer. Jackstadt, 96 Wash. App. at 513, 976 P.2d 190.
¶ 95 Nationscapital argues that Jackstadt is factually distinguishable. It asks us to limit the holding to situations in which a disqualified official is biased in favor of the subject of an agency's enforcement action. We decline Nationscapital's invitation to so narrowly construe our holding in Jackstadt.
¶ 96 First, Jackstadt is not factually distinguishable as Nationscapital asserts. Nationscapital incorrectly states that "the police chief was viewed as being biased in favor of the police officer" and "the police officer did not want the chief to disqualify herself." Appellant's Br. at 70. It is not clear whether the trooper considered the chief biased in his favor. WSP asked the trooper to either waive the chief's conflict of interest or agree to the appointment of a substitute. Jackstadt, 96 Wash.App. at 506-07, 976 P.2d 190. He refused, asserting that the chief "could neither act nor decline to act during the process of review; he proposed instead that the parties abandon the trial board's findings in favor of a new arbitration proceeding." Jackstadt, 96 Wash.App. at 506, 976 P.2d 190. Thus, the trooper apparently objected to the chief's disqualification not because he thought she would favor him, but because he hoped her double bind would thwart the review process altogether. In fact, the chief could as well have been biased against the trooper as a result of her prior involvement in his disciplinary matters.
¶ 97 Even assuming the chief was biased in Jackstadt's favor, Nationscapital asserts an untenable distinction. RCW 34.05.425(3) and.464(3) provide that a reviewing officer is disqualified for any reason "for which a judge is disqualified." The Jackstadt court notes that the Code of Judicial Conduct (CJC) governs judges, providing that "`[j]udges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances in which . . . the judge has a personal bias or prejudice concerning a party.'" 96 Wash.App. at 509, 976 P.2d 190 (quoting Canon 3(D) of the CJC). Under the CJC, disqualification is appropriate regardless of whether the judge's partiality favors or disfavors a party. And as Jackstadt illustrates, it may be difficult to discern whether the ground for disqualification cuts against or in favor of a party, setting up an issue for appeal in all cases where a disqualified official appoints a substitute reviewing officer if we were to adopt Nationscaptial's position.
¶ 98 We hold that, under the APA, Thomson was the appropriate authority to appoint his own substitute to serve as reviewing officer.

Appearance of Fairness Doctrine
¶ 99 Nationscapital next argues that if we do not interpret RCW 34.05.425(7) as permitting only unbiased agency heads to appoint a substitute reviewing officer, the statute violates the appearance of fairness doctrine. Nationscapital contends that allowing a disqualified person to select his or her own substitute is akin to permitting "one side in a sports contest to pick the referee." Appellant's Br. at 72. It asserts that a reasonably prudent and disinterested observer would not view a hearing as fair unless a neutral party selected the decision maker.
¶ 100 Generally, under the appearance of fairness doctrine, proceedings before administrative tribunals acting in a quasi-judicial capacity are valid only if "a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing." Wash. Med. Disciplinary Bd. v. Johnston, 99 Wash.2d 466, 478, 663 P.2d 457 (1983). The doctrine is intended to avoid the evil of participation in the decision-making process by a person who is personally interested or biased. City of Hoquiam v. Public Employment Relations Comm'n, 97 Wash.2d 481, 488, 646 P.2d 129 (1982).
¶ 101 Under the appearance of fairness doctrine, it is not necessary to show that a decisionmaker's bias actually affected the outcome, only that it could have. Buell v. City of Bremerton, 80 Wash.2d 518, 523, 495 P.2d 1358 (1972). But in the context of administrative proceedings, the appearance of fairness doctrine exists in tension with the presumption that public officials will properly *97 perform their duties. See Johnston, 99 Wash.2d at 479, 663 P.2d 457.
¶ 102 To overcome the presumption, a party invoking the appearance of fairness doctrine must come forth with evidence of actual or potential bias. Org. to Preserve Agric. Lands v. Adams County, 128 Wash.2d 869, 890, 913 P.2d 793 (1996) (evidence that commissioner received 63 phone calls during the prior year from a waste management company insufficient to demonstrate actual or potential bias because the commissioner had other matters pending with the company unrelated to the adjudicative proceeding); State v. Post, 118 Wash.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992) (no appearance of unfairness where presentence report was prepared by an allegedly biased person because there was no evidence of the judge's actual or potential bias); Magula v. Dep't of Labor & Indus., 116 Wash.App. 966, 972-73, 69 P.3d 354 (2003) (no appearance of unfairness where six electricians are among the 13 voting members deciding whether electrical work must be performed by electricians rather than general contractors).
¶ 103 The mere combination of investigative and adjudicative functions in the same tribunal does not violate the appearance of fairness doctrine. Johnston, 99 Wash.2d at 479-80, 663 P.2d 457. In Johnston, the Medical Disciplinary Board both investigated allegations of misconduct by a physician and later adjudicated the revocation of his medical license. Our Supreme Court held that "[t]he bare fact that the same administrative adjudicators also are clothed with investigative powers does not mean the case will be decided on an improper basis or that there will arise a prejudgment on the ultimate issues. We must presume the board members acted properly and legally performed their duties until the contrary is shown." Johnston, 99 Wash.2d at 479, 663 P.2d 457; see also Sherman v. Moloney, 106 Wash.2d 873, 884, 725 P.2d 966 (1986) (appearance of fairness not violated where disciplinary trial board included subordinates to an allegedly biased WSP chief).
¶ 104 Nationscapital relies on inapposite cases involving situations in which the decision maker had a personal interest in the matter under consideration. Chicago, Milwaukee, St. Paul & Pac. R.R. v. Wash. State Human Rights Comm'n, 87 Wash.2d 802, 557 P.2d 307 (1976) (appearance of unfairness where an appointed member of the hearing tribunal had a pending job application with one of the parties); Buell, 80 Wash.2d 518, 495 P.2d 1358 (appearance of fairness violated where planning commission member had a personal financial stake in a rezone decision); State ex rel. Beam v. Fulwiler, 76 Wash.2d 313, 456 P.2d 322 (1969) (commission could not adjudicate the appeal of a civil service employee where four of the five commission members had engaged in a multi-faceted and "concerted effort" to have him removed from office). Here, there is no evidence that the reviewing officer had a personal interest in the proceedings.
¶ 105 Nationscapital asserts that we should infer bias from the fact that the reviewing officer "just happened to agree with [DFI] on every significant issue and increased the amount of the fine recommended by the ALJ." Appellant's Reply Br. at 29-30. That an adjudicator considered the opponent's evidence and reasoning more persuasive does not sufficiently support an appearance of unfairness claim. See Swoboda v. Town of La Conner, 97 Wash.App. 613, 628, 987 P.2d 103 (1999), review denied, 140 Wash.2d 1014, 5 P.3d 9 (2000). Here, the reviewing officer reviewed each exception Nationscapital raised, rejecting most but agreeing with some. The reviewing officer stated his reasons for rejecting or accepting Nationscapital's arguments. The reviewing officer reasonably determined that the ALJ erred by holding Chisick personally liable for some disclosure violations but not others. The reviewing officer corrected the inconsistency  an error Nationscapital raised  by concluding that Chisick was personally liable for all the disclosure violations. We cannot infer bias merely because the reviewing officer ruled contrary to Nationscapital, where those rulings are fairly supported by the record and the law.
¶ 106 Nationscapital suggests that DFI's pecuniary interest in the decision raises the appearance of unfairness because of *98 the substantial fines DFI sought. The argument lacks merit.
¶ 107 Under Nationscapital's reasoning, DFI could never levy fines or penalties, regardless of who served as reviewing officer. Any link between the reviewing officer and DFI's pecuniary interest in fines is too attenuated to support an appearance of fairness claim. See In re Pers. Restraint of Haynes, 100 Wash.App. 366, 376-77, 996 P.2d 637 (2000) (no appearance of unfairness where salaried parole board members have an attenuated pecuniary interest in maintaining an incarcerated population).
¶ 108 Nationscapital likens Thomson's appointing Dellwo to the situation in Utica Packing Co. v. Block, 781 F.2d 71 (6th Cir. 1986). In Utica Packing, an agency head replaced a reviewing officer who had issued a final decision unfavorable to the agency's position. The substitute reviewing officer had no legal, regulatory, or adjudicatory experience. Under those facts, the court found the risk of unfairness "intolerably high." Utica Packing, 781 F.2d at 78. But contrary to Nationscapital's assertion, the principle of that case is not that "[b]iased agency heads cannot choose the final decision maker because it creates an appearance of unfairness." Appellant's Br. at 75. Rather, in the court's words: "There is no guarantee of fairness when the one who appoints a judge has the power to remove the judge before the end of proceedings for rendering a decision which displeases the appointer." Utica Packing, 781 F.2d at 78. Utica Packing is factually distinguishable from this situation.
¶ 109 Here, Nationscapital fails to establish the bias of either Thomson or the reviewing officer. Thomson's role in the investigation, without more, does not establish bias. Under the APA's separation of functions provision, he may not serve in the dual capacity of investigator and adjudicator. But his statutory disqualification from adjudicating the matter, without more, does not amount to personal interest or bias for purposes of the appearance of fairness doctrine. As already noted, the combination of investigative and adjudicative functions does not violate the appearance of fairness doctrine. Johnston, 99 Wash.2d at 478, 663 P.2d 457. And we cannot infer prejudgment of issues from an official's determination that probable cause exists to bring an enforcement action because different standards of proof apply in determining whether violations actually occurred. See Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Thomson's role in directing the scope and direction of the investigation does not evidence personal bias or prejudice.
¶ 110 Because Nationscapital does not establish Thomson's bias, let alone the reviewing officer's, its appearance of fairness claim fails.

Denial of Discovery
¶ 111 Nationscapital contends that DFI and Dellwo erred by denying discovery on the issue of why DFI appointed Dellwo. Nationscapital complains that, as a result, it could not support its claim as to the reviewing officer's bias. In its view, discovery was "critically important" to determine the relationship between Bley and/or Thomson and Dellwo and the reasons for Dellwo's selection.
¶ 112 Courts should not probe the mental processes of administrative officials in making a decision. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) (district court erred in permitting opponents of an agency decision to depose the agency head and probe his reasons for issuing certain orders). "Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected." Morgan, 313 U.S. at 422, 61 S.Ct. 999 (citation omitted). In the absence of evidence to the contrary, courts should "presume public officers perform their duties properly, legally, and in compliance with controlling statutory provisions." Ledgering v. State, 63 Wash.2d 94, 101, 385 P.2d 522 (1963).
¶ 113 An exception exists when the record is insufficient to permit meaningful judicial review of an agency decision. In Ledgering, for instance, the Department of Licensing summarily revoked the plaintiff's driver's license. 63 Wash.2d at 101-02, 385 P.2d 522. At issue was whether the director failed to *99 exercise his discretionary authority but, instead, impermissibly delegated the decisionmaking process to subordinates. The court remanded for further factual findings on the question.
¶ 114 Similarly, in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Supreme Court remanded for inquiry into an administrator's reasons for approving a highway project, where the law permitted approval only in the absence of feasible alternatives. The administrative record did not adequately reveal whether the administrator considered such alternatives. The Court held that inquiry into the official's decision-making process was necessary for effective judicial review under the APA to determine whether the official considered the relevant factors in rendering a decision. But the Court held that where administrative findings do set forth the grounds of decision, "there must be a strong showing of bad faith or improper behavior before such inquiry may be made." Overton Park, 401 U.S. at 420, 91 S.Ct. 814.
¶ 115 Nationscapital contends that discovery was appropriate in this case because the record does not reveal Thomson's reasons for appointing Dellwo. But unlike in Ledgering or Overton Park, inquiry into the administrator's decision-making process is not necessary for effective judicial review. Nationscapital does not contend that Thomson failed to exercise his discretion, as in Ledgering. Nor does Nationscapital contend that Thomson failed to apply the relevant statutorily prescribed factors, as in Overton Park. Thomson's appointment of the reviewing officer was a matter within his discretion. Because Nationscapital advanced no evidence showing that Thomson exercised that discretion contrary to law, DFI and Dellwo did not err in denying discovery.
¶ 116 Nationscapital relies on other inapposite cases to argue that the denial of discovery was improper. Hummel v. Heckler, 736 F.2d 91 (3rd Cir.1984); Chrobuck v. Snohomish County, 78 Wash.2d 858, 480 P.2d 489 (1971); City of Lake Forest Park v. Shorelines Hearings Bd., 76 Wash.App. 212, 884 P.2d 614 (1994).
¶ 117 Hummel involved the appeal of a denial of social security benefits. The court permitted the claimant to discover whether the ALJ was subject to a controversial statistical performance review that may have biased his decision. The claimant presented evidence that the agency head discouraged ALJs from granting claims by subjecting them to the performance review. Unlike in Hummel, here Nationscapital has not made the required preliminary showing that the reviewing officer was biased.
¶ 118 The factual recitation of Chrobuck states that a challenger to a city's rezone decision took the deposition of one of the planning commission members, who went on an all expense paid trip to visit an oil refinery of the rezone applicant. 78 Wash.2d at 866, 480 P.2d 489. The court also notes, without analysis, that the planning commission refused a request for further inquiry on the personal entanglements of other commission members in the applicant's affairs. The propriety of discovery was not an issue in the case.
¶ 119 City of Lake Forest Park involved a challenge to a decision of the Shoreline Hearings Board. After alleging that absent voting members relied on defective audiotapes, the challenger obtained an ex parte order granting discovery of the audiotapes. City of Lake Forest Park, 76 Wash.App. at 216, 884 P.2d 614. The propriety of discovery was not an issue in the case.
¶ 120 Nationscapital presents evidence outside the record that Dellwo lacked qualifications for the position, i.e., a press release announcing his law firm employment. But DFI correctly points out that Dellwo, an attorney, participated in drafting legislation amending the Mortgage Broker Practices Act while serving in the legislature. Contrary to Nationscapital's assertion, Dellwo's legal training and legislative experience in the regulation of mortgage brokers indicate that he had appropriate qualifications to serve as the reviewing officer.
¶ 121 Because Nationscapital failed to make a threshold showing of either Thomson's *100 and/or Dellwo's bias, DFI did not err by refusing discovery on the issue.

Due Process
¶ 122 Nationscapital asserts that it has a constitutional due process right to the appointment of a reviewing officer by a neutral party.
¶ 123 The procedural due process clause constrains the government's power to deprive individuals of liberty or property interests within the meaning of the fifth and fourteenth amendments to the United States Constitution. Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Both the imposition of fines and the revocation of a professional license are subject to the due process clause. Johnston, 99 Wash.2d at 474, 663 P.2d 457. Due process requires an opportunity to be heard before a neutral adjudicator. Johnston, 99 Wash.2d at 475, 663 P.2d 457. The principles governing the disqualification of judges apply as well to administrative agencies. Ritter v. Bd. of Comm'rs of Adams County Pub. Hosp. Dist. No. 1, 96 Wash.2d 503, 513, 637 P.2d 940 (1981) (no due process violation where a physician testified at a hearing to suspend a doctor's license and then sat on the post-suspension reviewing board). Prejudgment bias, partiality, or personal interest may disqualify an adjudicator. Johnston, 99 Wash.2d at 474, 663 P.2d 457. But we presume that an adjudicator is impartial, and a party alleging bias must make an affirmative showing that it exists. Ritter, 96 Wash.2d at 513, 637 P.2d 940.
¶ 124 A mere "predilection" toward a particular result does not violate due process unless it prevents an agency official from deciding a case fairly. Johnston, 99 Wash.2d at 475, 663 P.2d 457. Nor does the combination of investigatory, prosecutory, and adjudicatory functions violate due process. Johnston, 99 Wash.2d at 477, 663 P.2d 457 (no due process violation where medical disciplinary committee presides over a license suspension hearing evolving from its own investigation) (citing Withrow, 421 U.S. at 47, 95 S.Ct. 1456). In Withrow, the Supreme Court observed that where an adjudicator has a pecuniary interest in the proceeding or has been the subject of personal abuse by the party, then the probability of actual bias is intolerably high; but where the alleged bias results from the combination of investigative and adjudicative powers in an administrative agency, the challenger must overcome the presumption of honesty and integrity in the adjudicator. 421 U.S. at 47, 95 S.Ct. 1456.
¶ 125 Nationscapital relies on inapposite cases that involve bias by an adjudicator, not the person who appointed the adjudicator. Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (insurance company's due process violated where a supreme court justice affirmed a jury award against the insurer although he had a personal financial stake in a pending class action suit involving the same issues); New York State Inspection, Sec. & Law Enforcement Employees v. New York State Pub. Employment Relations Bd., 629 F.Supp. 33 (N.D.N.Y.1984) (denying Fed.R.Civ.P. 12(b)(6) motion where the decision maker charged with reviewing a penalty for an illegal strike allegedly had improper ex parte discussions on the merits of the case and made public comments indicative of prejudgment bias).
¶ 126 Here, there is no evidence that Dellwo was biased against Nationscapital. Moreover, Nationscapital does not even establish that Thomson was biased. Thomson's role in investigating and preparing the statement of charges against Nationscapital does not indicate actual bias, under either Johnston or Withrow, because it does not follow that he would be unwilling to fairly consider any defenses offered during the hearing. Thus, Nationscapital's constitutional due process claim fails.
¶ 127 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: QUINN-BRINTNALL, C.J., and HUNT, J.
NOTES
[1] DFI provides regulatory oversight for the state's financial service providers. The legislature created it in 1993, when it merged two state agencies, the Division of Banking and the Division of Securities. Chapter 43.320 RCW. DFI regulates banks, credit unions, mortgage brokers, consumer loan companies, and securities issuers and salespeople.
[2] In the unpublished portion of this opinion, we reject Nationscapital's latter three arguments.
[3] Not to be confused with GMAC Mortgage Corporation, a subsidiary of the General Motors Acceptance Corporation.
[4] See RCW 34.05.461(4); Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 733, 696 P.2d 1222 (1985) ("Relevant hearsay evidence is admissible in administrative hearings.").