FILED
COURT OF APPEALS
DIVISION II

2014 DEC 16 AM 8: 33

STATE OF WASHINGTON

BY_____
              DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| LONNITA HASKINS, | No. 44655-3-II |
| Appellant/Cross-Respondent, | |
| v. | |
| MULTICARE HEALTH SYSTEM, a Washington corporation d/b/a Tacoma General Hospital, | UNPUBLISHED OPINION |
| Respondent/Cross-Appellant, | |
| TACOMA RADIOLOGICAL ASSOCIATES, P.S., a Washington corporation; and Unknown "John Does" and "John Doe Clinics," | |
| Defendants. | |

JOHANSON, C.J. — Lonnita Haskins appeals the trial court's judgment entered in Multicare Health System d/b/a Tacoma General Hospital's (Multicare) favor. She argues that (1) she was entitled to a jury instruction on res ipsa loquitur, (2) the trial court erred when it permitted Multicare to present evidence of collateral source payments, and (3) the trial court improperly instructed the jury about the burden of proof during voir dire and erred when it permitted Multicare's closing argument that the jurors could choose a burden of proof for themselves.

We hold that it was reversible error to fail to give Haskins's proposed res ipsa loquitur instruction and that it was not error to permit Multicare to present evidence of past collateral source payments. Accordingly, we vacate the judgment in Multicare's favor, remand for a new trial, and do not reach Haskins's voir dire and closing argument issues.

On cross appeal, Multicare argues that the trial court erred when it excluded Multicare's designated ER 615 in-court representative and when it declined to give Multicare's proposed jury instruction regarding the tax consequences of personal injury awards.

We hold that the trial court abused its discretion when it denied Multicare's request to designate an employee who is also a fact witness in the case as its in-court representative under ER 615, but it was not an abuse of discretion to decline to give Multicare's proposed jury instruction on the tax consequences of personal injury awards.

FACTS

I. HASKINS'S SURGERY

In 2007, Haskins was diagnosed with cervical cancer. After radiation treatments, Haskins had an Indiana pouch surgery in order to correct incontinence.

In March 2009, Dr. Bahman Saffari performed the surgery. Indiana pouch surgery involves removing portions of the large and small intestines and using them to create a new "urinary reservoir." 1 Report of Proceedings (RP) (Jan. 16, 2013) at 24. The patient's kidneys are essentially detached from the bladder and reconnected to the new Indiana pouch reservoir, bypassing the bladder. Indiana pouch surgery also involves the insertion of two stents to help drain urine into bags so that urine output is monitored during recovery and pressure is relieved on the

pouch while it heals. Dr. Saffari also inserted a Malecot tube that allows hospital staff to flush the pouch.

Dr. Saffari thought that Haskins's surgery was successful and that there was an 80 to 90 percent chance that the new Indiana pouch would function as her bladder for the remainder of her life. However, during her recovery, Haskins experienced complications. At 4:00 PM on March 11, Haskins was recovering in the hospital and Nurse Shaleeni Fortner assessed Haskins and verified that her stents were secure.

At 9:59 PM, certified nurse assistant Ashley Barker emptied the urine bags. Barker was trained on how to handle lines and drains and knew that the stents attached to the urine bags should not be pulled. She denied that she would ever hang the urine bags over the bedside. She claimed she did not notice whether Haskins's stents had been pulled out because the blankets of her bed were covering the tubes. But Haskins's urine output was good.

At 11:00 PM, Haskins noticed that her stents were not putting out any urine. After Nurse Fortner and the charge nurse, Nurse Debbie Dick, made a complete assessment, they found that there had not been any urine output but that nothing appeared to be out of place and that there were not "any problems at the stent." 4 RP (Jan. 17, 2013) at 280-81.

At 11:45 PM, Nurse Rebecca Sumey noticed that Haskins's urine output was still low based on when Barker had last emptied the bags at 9:59 PM. Nurse Sumey was the first person to notice that Haskins's stents had become dislodged and testified that they had been pulled out about 14 inches. Nurse Sumey's entry in the records that night stated that the stents had been pulled out 50 to 60 centimeters. Haskins told Nurse Sumey that she thought the stents became dislodged when Barker hung the urine bags over the side of the bed.

The next morning, Dr. Saffari discussed Haskins's stents and urine output with her and she told him that she thought Barker had hung the urine bags over the side of the bed. However, at trial, Haskins did not remember anything that happened on March 11 and did not remember seeing the bags hanging over the side of her bed. Because the stents became dislodged, Haskins experienced acute renal failure. Although she made a complete recovery, because of the stent complications, Haskins required an additional procedure and additional recovery time to correct the problem with her stents and to avoid permanent kidney damage.

## II. THE TRIAL

In a motion in limine, Haskins argued that evidence of collateral source payments should not be admitted because RCW 7.70.080 is unconstitutional. The trial court admitted evidence of past compensation but excluded evidence of future collateral source payments.

Multicare designated Barker as its in-court representative pursuant to ER 615. Haskins moved in limine to exclude Barker because she was a "critical witness." 1 RP (Jan. 14, 2013) at 3. The court agreed and granted Haskins's motion because Barker was a factual witness.

Haskins offered expert testimony from two witnesses, Dr. Oliver Dorigo, the chief gynecologic oncologist at Stanford University, and Karen Huisinga, a nurse practitioner. Both testified that the most likely explanation for her stents becoming dislodged 10 to 14 inches was hospital negligence. Nurse Huisinga also testified that hanging urine bags over the side of the bed falls below the standard of care for nurses and that, in her opinion, Haskins's injury probably happened when Barker hung the bags over the bedside.

4

Haskins also called Dr. Saffari, Nurses Fortner, Barker, Sumey, and Katherine Bechtold[1] as fact witnesses and to establish the appropriate standards of care in nursing. Haskins also testified.

Multicare also offered testimony from two experts: Cheyenne Haines, a nurse with experience caring for recovering surgery patients, and Dr. Karny Jacoby, a urologist who testified that she prefers not to perform Indiana pouch surgeries. Dr. Jacoby also provided an expert opinion that "[t]ubes fall out all the time" and that it often happens when patients roll around in bed or if patients are confused and pull them out themselves. 2 RP (Jan. 24, 2013) at 25.

Multicare proposed a jury instruction stating that personal injury awards are not taxable. The instruction stated, "Any award to plaintiff will not be subject to federal income tax, and therefore you should not add or subtract for such taxes in fixing the amount of any award." Clerk's Papers (CP) at 163. The trial court refused to give the instruction because "it would conflict with the no insurance instruction." 5 RP (Jan. 29, 2013) at 184.

Haskins proposed the standard 6 *Washington Practice: Washington Pattern Jury Instructions: Civil* 22.01, at 255 (6th ed. 2012) (WPI) instruction on res ipsa loquitur. She claimed that she was entitled to the instruction based on expert testimony and recent case law. Multicare argued that Haskins did not show that "she wasn't the sole cause" of her injury and that res ipsa loquitur should only be applied "sparingly." 5 RP (Jan. 29, 2013) at 147. The trial court declined to give Haskins's proposed instruction.

---

[1] Nurse Bechtold was Multicare's chief nursing officer.

The jury found in Multicare's favor and the trial court entered judgment accordingly. Haskins appeals from that judgment.

## ANALYSIS

### I. THE PROPOSED RES IPSA LOQUITUR JURY INSTRUCTION

Haskins argues that the trial court erred when it failed to instruct the jury on res ipsa loquitur. We agree and, accordingly, vacate the judgment and remand for a new trial.

### A. STANDARD OF REVIEW AND RELEVANT LAW

Whether a plaintiff is entitled to a res ipsa loquitur instruction is a question of law that we review de novo. *Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003). Res ipsa loquitur establishes only a permissive inference of negligence. *Curtis v. Lein*, 169 Wn.2d 884, 889, 239 P.3d 1078 (2010) (quoting *Zukowsky v. Brown*, 79 Wn.2d 586, 600, 488 P.2d 269 (1971)). Res ipsa loquitur is applied only sparingly "'in peculiar and exceptional cases, and only where the facts and the demands of justice make its application essential.'" *Tinder v. Nordstrom, Inc.*, 84 Wn. App. 787, 792, 929 P.2d 1209 (1997) (quoting *Morner v. Union Pac. R.R. Co.*, 31 Wn.2d 282, 293, 196 P.2d 744 (1948)).

Res ipsa loquitur applies where the plaintiff can demonstrate

(1) the accident or occurrence that caused the plaintiff's injury would not ordinarily happen in the absence of negligence, (2) the instrumentality or agency that caused the plaintiff's injury was in the exclusive control of the defendant, and (3) the plaintiff did not contribute to the accident or occurrence.

*Curtis*, 169 Wn.2d at 891 (citing *Pacheco*, 149 Wn.2d at 436). A plaintiff is entitled to a res ipsa loquitur instruction if each element is supported by substantial evidence. WPI 22.01, author's cmts. at 256 (citing *Pacheco*, 149 Wn.2d at 444). Substantial evidence is evidence that is "of a

6

sufficient quantum to persuade a fair-minded person of the truth of a declared premise."

*Nationscapital Mortg. Corp. v. Dep't of Fin. Insts.*, 133 Wn. App. 723, 738, 137 P.3d 78 (2006).

### B. THE ELEMENTS OF RES IPSA LOQUITUR

1.  FIRST ELEMENT – THE INJURY IS NOT THE KIND THAT ORDINARILY HAPPENS IN THE ABSENCE OF NEGLIGENCE

The primary dispute here is whether Haskins offered substantial evidence that her injury is of the kind that does not ordinarily occur in the absence of negligence. Haskins argues that Dr. Dorigo's expert testimony was sufficient to persuade a fair-minded person that stents do not ordinarily slip 14 inches outside a patient's body in the absence of negligence. We agree and conclude that Haskins provided substantial evidence that her injury is not of the type that ordinarily happens in the absence of negligence.

A plaintiff may prove that the accident producing the injury does not normally happen in the absence of negligence in one of three ways:

> "(1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) *when proof by experts in an esoteric field creates an inference that negligence caused the injuries.*"

*Curtis*, 169 Wn.2d at 891 (emphasis added) (internal quotation marks omitted) (quoting *Zukowsky*, 79 Wn.2d at 595).

At trial, Haskins relied on the third prong: that her expert in an esoteric field, Dr. Dorigo, created an inference that negligence caused the injuries. Dr. Dorigo is a gynecologic oncologist

and has performed dozens of urinary diversion surgeries.[2] Dr. Dorigo's testimony provided substantial evidence that negligence was the cause of her injuries. He testified that he had performed 20 Indiana pouch surgeries and 20 additional urinary diversion surgeries. Haskins's attorney asked, "Have you personally every [sic] had a ureteral stent pulled out of the body 10 to 14 inches following one of those operations?" RP (Jan. 22, 2013) at 8. Dr. Dorigo answered that he had neither had that happen to one of his patients nor had he ever heard of such a problem occurring in his time at University of California Los Angeles. RP (Jan. 22, 2013) at 8. Dr. Dorigo testified that, in his opinion, negligence was the most likely cause of Haskins's injury in this case.

We conclude that the trial testimony satisfies the first of the three elements needed to support Haskins's res ispa loquitur instruction. Dr. Dorigo's testimony identifying the hospital's negligence as the most likely explanation for Haskins's injury is enough to persuade a fair-minded individual that her injury is not the type that ordinarily happens in the absence of negligence. *Brown v. Dahl*, 41 Wn. App. 565, 581 n.12, 705 P.2d 781 (1985).

> 2.     MULTICARE'S NONNEGLIGENT EXPLANATION MUST COMPLETELY EXPLAIN HASKINS'S INJURY

Multicare argues that several witnesses, including Dr. Dorigo, Dr. Saffari, and Dr. Jacoby, testified that ureteral stents slip out frequently and inadvertently without negligence. Haskins argues that her burden is only to provide substantial evidence that this type of injury ordinarily does not happen in the absence of negligence, even if Multicare can present possible, "non-negligent explanations." Br. of Appellant at 23. We agree with Haskins.

---

[2] Neither party contests that urinary diversion surgery is the esoteric field in which his expert opinion is relevant.

Haskins is entitled to a jury instruction on res ipsa loquitur unless there is other evidence that completely explains her injury. *Pacheco*, 149 Wn.2d at 440. In *Pacheco*, an oral surgeon who performed a wisdom tooth extraction procedure drilled in the wrong place in his patient's mouth. 149 Wn.2d at 434. Dr. Ames informed him that because the x-ray was misprinted with an "LR," he had drilled in the wrong place. *Pacheco*, 149 Wn.2d at 434-35. The *Pacheco* court directly addressed whether res ipsa loquitur is appropriate where evidence exists that the injury could have happened without the defendant's negligence. *See* 149 Wn.2d at 438-39. The court held that res ipsa loquitur is only defeated by an alternative explanation where "an inference [of negligence] is not possible, and thus there is nothing upon which the doctrine can operate." *Pacheco*, 149 Wn.2d at 440 (citing *Covey v. W. Tank Lines, Inc.*, 36 Wn.2d 381, 391, 218 P.2d 322 (1950)). The plaintiff is entitled to the instruction as long as she presents substantial evidence to satisfy each element and other evidence does not "*completely* explain[ ]" the injury. *Pacheco*, 149 Wn.2d at 440.

Here, Dr. Saffari testified that the stents can become dislodged in the absence of negligence, either inadvertently or as the result of a patient's natural movements in bed. Dr. Dorigo also testified that stents are slippery objects and can "[t]heoretically" become dislodged even in the absence of negligence. RP (Jan. 22, 2013) at 40. Multicare's expert, Dr. Jacoby, testified that "[t]ubes fall out all the time" even in the absence of any negligence. 2 RP (Jan. 24, 2013) at 25. Multicare certainly presented alternate explanations for Haskins's injury: inadvertent slippage or the patient's natural movements. But *Pacheco* does not require Haskins to rule out all other explanations. *See* 149 Wn.2d at 440. She is entitled to the instruction where she has presented substantial evidence of each element of res ipsa loquitur, unless an alternate explanation

completely explains her injury. WPI 22.01, author's cmts. at 256 (citing *Pacheco*, 149 Wn.2d at 444).

Like in *Pacheco*, Haskins's injury could be based either on Multicare's negligence or other nonnegligence explanations. Because Haskins presented substantial evidence of the first element of res ipsa loquitur, the burden is shifted to Multicare to completely explain her injury in order to defeat her claim to an instruction. *Pacheco*, 149 Wn.2d at 440. However its evidence only suggests another explanation and does not rule out its own negligence. Multicare is free to present alternate explanations; each will be presented to the jury and it is up to the jury to decide the issue. *See Pacheco*, 149 Wn.2d at 440-41. Based on Dr. Dorigo's testimony alone, as an expert in an esoteric field—urinary diversion surgeries—Haskins presented substantial evidence that her injury is not the type that happens in the absence of negligence and Multicare has not provided sufficient evidence to completely explain her injury. *Curtis*, 169 Wn.2d at 891.

Therefore, we conclude that Haskins satisfied the first of the three elements and the trial court erred when it found that she had not.

### 3. SECOND ELEMENT – THE INJURIES WERE CAUSED BY AN AGENCY OR INSTRUMENTALITY WITHIN THE EXCLUSIVE CONTROL OF THE DEFENDANT

The parties did not argue at trial nor do they argue on appeal that the second element of res ipsa loquitur was at issue. Thus, we decline to review the second element and hold that Haskins provided substantial evidence that Multicare was in exclusive control of the instrumentality that caused her injury.

4. THIRD ELEMENT – THE INJURY-CAUSING ACCIDENT IS NOT DUE TO ANY VOLUNTARY ACTION OR CONTRIBUTION ON THE PART OF THE PLAINTIFF

Haskins argues that Dr. Dorigo and Nurse Huisinga provided substantial evidence that Haskins's own acts did not cause or contribute to her own injury and that Multicare's suggestion otherwise is speculation and, ultimately, a question of fact for the jury. We agree with Haskins that she presented substantial evidence that she did not voluntarily cause or contribute to her injury.

Where Haskins presents substantial evidence that she did not contribute to her injury, she is entitled to a res ipsa loquitur jury instruction. WPI 22.01, author's cmts. at 256 (citing *Pacheco*, 149 Wn.2d at 444). Substantial evidence exists where the plaintiff has provided enough evidence to persuade a fair-minded person of the truth of her assertion. *Nationscapital Mortg. Corp.*, 133 Wn. App. at 738. According to the comment to WPI 22.01, the third element is "rarely" needed in a jury instruction because "'the advent of comparative fault should logically eliminate the element of the absence of the plaintiff's contribution to the accident . . . unless the plaintiff's negligence appears to be the sole proximate cause of the event.'" WPI 22.01, author's cmts. at 258 (quoting *Tinder*, 84 Wn. App. at 795 n.23).

Haskins's theory of her injury is that Barker, when she drained her urine bags just before 10:00 PM, hung the bags over the bedside, which caused her stents to become dislodged. Dr. Dorigo's testimony alone indicates that this and not any of Haskins's movements or voluntary actions was the most likely cause of Haskins's injury. He testified that in his opinion and based on his experience and his review of Haskins's medical records, her stents became dislodged when Barker hung Haskins's urine bags over the side of the bed and that they would not have slipped 10 to 14 inches outside her body if Haskins had voluntarily caused the slippage herself. Haskins's

medical records reflect that Haskins also told Dr. Saffari that the stents were accidentally dislodged by hanging the draining bags over the bed.

Nurse Huisinga also opined that because of the manner in which Haskins's stents became dislodged, Haskins had not caused the dislodgement herself either voluntarily or inadvertently. In her opinion, if Haskins had experienced a "psychotic moment" or became confused, she would have pulled the Malecot tube out first and not the stents. RP (Jan. 22, 2013) at 80. She thought that Haskins was not the "mechanism for this -- the stents being removed -- at all." RP (Jan. 22, 2013) at 80. Nurse Huisinga's testimony, coupled with the testimony of Dr. Dorigo, is sufficient to persuade a fair-minded person that Haskins did not voluntarily cause or contribute to her injury.

Multicare's argument that Haskins could have contributed to her injury misses the point and ignores the standard of review. Haskins's burden is only to provide substantial evidence that she did not voluntarily contribute to the "accident or occurrence" that caused her injury; she need not completely exclude her own contribution as a *potential* cause. *Pacheco*, 149 Wn.2d at 444. Dr. Dorigo and Dr. Saffari agreed that stents on occasion can slip from the patient's natural movements. But Haskins is not required to eliminate all doubt as to whether she could have contributed to the injury in order to get an instruction. *Pacheco*, 149 Wn.2d at 444. She need only present substantial evidence that she did not contribute to the injury-causing accident. The trial court, therefore, should not weigh Haskins's theory of the case against Multicare's. Once she meets the substantial evidence threshold, Haskins is entitled to a res ipsa loquitur instruction unless Multicare can prove that Haskins's was "'the sole proximate cause of the event.'" WPI 22.01, author's cmts. at 258 (quoting *Tinder*, 84 Wn. App. at 795 n.23).

12

Here, apart from testimony that Haskins's contribution could have theoretically caused the stents to become dislodged in this way, Multicare presented no evidence that was what happened here. Accordingly, we cannot conclude that Haskins's own voluntary actions were the "sole proximate cause" of her injuries. Haskins met her burden when she supported her theory (that the stents became dislodged as a result of Barker's negligence) with enough evidence to persuade a fair-minded person of its truth.

Accordingly, we hold that Haskins provided substantial evidence that she did not voluntarily cause or contribute to her injury and, instead, that Barker's negligence caused her injury.

## C. Conclusion

Because Haskins provided substantial evidence to support all required res ipsa loquitur elements, we hold that it was error to fail to give Haskins's proposed res ipsa instruction. We vacate the judgment in Multicare's favor and remand for a new trial.

## II. The Collateral Source Doctrine in Medical Malpractice Cases and the Constitutionality of RCW 7.70.080

Haskins argues that RCW 7.70.080, permitting parties to present evidence of past collateral source payments in medical malpractice cases, is unconstitutional because it violates separation of powers principles and, therefore, the trial court erred when it permitted Multicare to offer evidence of past collateral source payments.[3] Specifically, Haskins argues that the common law collateral

---

[3] Multicare argues, as a threshold issue, that Haskins failed to preserve the constitutionality question. We conclude that Haskins did preserve the issue because Haskins's motion in limine explicitly requested that the trial court either exclude evidence of collateral source payments because RCW 7.70.080 is unconstitutional, or, in the alternative, limit the collateral source evidence that Multicare could present to past compensation based on the language of the statute.

source doctrine is a procedural court rule and where a statute conflicts with a procedural court rule, separation of powers principles are implicated and the statute is unconstitutional. We disagree. Because the common law collateral source doctrine is not a court rule and Haskins does not identify a formal court rule that conflicts with RCW 7.70.080, there is no violation of separation of powers principles. Accordingly, RCW 7.70.080 is constitutional with respect to the admission of evidence of past collateral source payments and the trial court did not err when it permitted Multicare to present such evidence.

### RCW 7.70.080 IS CONSTITUTIONAL

There are some fundamental functions which are inherent in the power of the judicial branch; among them is the power to promulgate rules for practice in the courts. *Putman v. Wenatchee Valley Med. Ctr., PS*, 166 Wn.2d 974, 980, 216 P.3d 374 (2009). But where it is alleged that (1) a statute conflicts with a court rule, we (2) attempt to harmonize them and give effect to both but, where this is impossible, (3) the court rule prevails in procedural matters and the statute prevails in substantive matters. *Putman*, 166 Wn.2d at 980.

The procedure for adopting and amending court rules is explained in GR 9, entitled "Supreme Court Rulemaking." This process involves a request to amend, adopt, or repeal a rule; the Supreme Court's initial consideration of the proposed rule; consideration by the Washington State Bar Association and the lower courts; the opportunity for notice and public comment; and final adoption by the Supreme Court. GR 9(d), (f)-(h).

Haskins's argument here fails at the first step in a separation of powers analysis because the collateral source doctrine is not a formal court rule. It was not adopted through the Supreme Court rulemaking process but is, rather, a common law doctrine. *Adcox v. Children's Orthopedic*

14

*Hosp. & Med. Ctr.*, 123 Wn.2d 15, 40, 864 P.2d 921 (1993) ("RCW 7.70.080 replaces the *common law's* collateral source rule") (emphasis added). Haskins, therefore, points to no conflict between the statute and a court rule, but instead argues that the common law collateral source doctrine should be treated as if it were a formal court rule for the purpose of a separation of powers analysis. She points to no authority to support this argument, however, and we are aware of none. Without a formal court rule, there is no conflict between that rule and a statute and, thus, no violation of the separation of powers.

First, to support her argument, Haskins asks us to apply the holding from *Diaz v. State*, 175 Wn.2d 457, 285 P.3d 873 (2012), to this case. But *Diaz* is distinguishable. In *Diaz*, the plaintiff was misdiagnosed with cancer. 175 Wn.2d at 460. Diaz settled with some of the defendants and sought to exclude evidence of these settlements at trial, but the court admitted the evidence under RCW 7.70.080. *Diaz*, 175 Wn.2d at 461. Our Supreme Court held that RCW 7.70.080 violates separation of powers principles and is thus unconstitutional to the extent that it conflicts with ER 408, prohibiting the admission of settlement evidence generally, because ER 408 and RCW 7.70.080 cannot be harmonized and ER 408 is a procedural, not substantive, court rule. *Diaz*, 175 Wn.2d at 471.

Here, Haskins asks us to resolve a different kind of conflict. The conflict in this case is between the collateral source doctrine and RCW 7.70.080. Unlike ER 408, however, the collateral source doctrine is not a formal court rule, and Haskins does not argue that RCW 7.70.80 conflicts with any other formal court rule. We conclude, therefore, that *Diaz* does not apply.

Second, the separation of powers analysis that Haskins asks us to apply to resolve the conflict between RCW 7.70.080 and the collateral source doctrine has been applied only to defeat

15

statutes that conflict with formal court rules. *See, e.g., Diaz,* 175 Wn.2d at 470-71 (RCW 7.70.080 is unconstitutional where it conflicts with ER 408, prohibiting the admission of evidence of settlements); *Putman,* 166 Wn.2d at 982-85 (RCW 7.70.150 is unconstitutional because its requirement that plaintiffs file a certificate of merit with medical malpractice claims conflicts with pleading requirements in CR 8 and CR 11); *Waples v. Yi,* 169 Wn.2d 152, 158-61, 234 P.3d 187 (2010) (RCW 7.70.100(1) conflicts with CR 3(a) and is unconstitutional because it requires an additional step to commence a civil action in medical malpractice cases); *State v .Gresham,* 173 Wn.2d 405, 428-32, 269 P.3d 207 (2012) (RCW 10.58.090 conflicts with ER 404(b) because it permits the admission of prior misconduct for character evidence purposes). Haskins tries to equate the common law collateral source doctrine with a formal court rule in order to set up a separation of powers violation. Our precedent does not support this view and her claim fails.

Finally, in *Adcox,* our Supreme Court recognized that RCW 7.70.080 "replaces" the common law collateral source doctrine. 123 Wn.2d at 40. In *Adcox,* the hospital sought to present evidence of collateral source payments to the jury and the trial court found that it, instead, would make any necessary collateral source offsets posttrial. 123 Wn.2d at 40. Our Supreme Court held that, under the language of the statute, the hospital was entitled to present collateral source evidence to the finder of fact. *Adcox,* 123 Wn.2d at 40-41. Although the court was not asked to pass on the constitutionality of the statute, it stated that RCW 7.70.080 replaces the collateral source doctrine, acknowledging that RCW 7.70.080 was a proper exercise of legislative power. *Adcox,* 123 Wn.2d at 40-41.

Because the common law collateral source doctrine is not a court rule and Haskins does not identify a formal court rule that conflicts with RCW 7.70.080, there is no violation of

separation of powers principles. Accordingly, RCW 7.70.080 is constitutional with respect to the admission of evidence of past collateral source payments and the trial court did not err when it permitted Multicare to present such evidence.

## III. MULTICARE'S CROSS APPEAL

Because the trial court failed to give the res ipsa loquitur instruction, we remand for a new trial and, thus, we reach the merits of Multicare's cross appeal. Multicare argues that the trial court improperly excluded its designated ER 615 in-court representative from the courtroom, and that the trial court abused its discretion when it failed to instruct the jury regarding the tax consequences of personal injury awards. We agree that the trial court improperly excluded Multicare's designated ER 615 representative, but conclude that the court did not abuse its discretion when it failed to give the proposed instruction on the tax consequences of personal injury awards.

### A. THE EXCLUSION OF MULTICARE'S DESIGNATED ER 615 REPRESENTATIVE

Multicare first argues that the trial court improperly excluded its representative, Barker, from the courtroom in violation of ER 615. We agree.

We review interpretation of evidentiary rules de novo. *Diaz*, 175 Wn.2d at 462 (citing *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007)). Once we determine that the rule was interpreted correctly, we review a trial court's decision for an abuse of discretion. *Diaz*, 175 Wn.2d at 462 (citing *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001)). A trial court abuses its discretion when it misinterprets a rule. *Diaz*, 175 Wn.2d at 462. We apply the same principles to interpret an evidence rule that we apply when interpreting a statute. *Gourley v. Gourley*, 158 Wn.2d 460, 466, 145 P.3d 1185 (2006). We consider the plain language of the rule and when the

17

rule's meaning is plain on its face, we will give effect to its plain meaning as an expression of the intent of the drafting body. *Gourley*, 158 Wn.2d at 466.

ER 615 states,

> At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be reasonably necessary to the presentation of the party's cause.

We begin our interpretation of ER 615 by considering its plain meaning. *Gourley*, 158 Wn.2d at 466. In general, the rule gives the trial court broad discretion to exclude witnesses except in three enumerated circumstances. In those three circumstances, the rule's language explicitly "does not authorize exclusion" of witnesses. ER 615. Based on the plain language of ER 615(2), the trial court is without authority to exclude a witness from the courtroom where (1) the party is not a natural person, (2) the witness is the party's employee, and (3) the party's attorney designates her to be its representative in court.

A simple application of this rule shows that the trial court misinterpreted it. Multicare is the defendant and is a Washington corporation, not a natural person. It is undisputed that Barker was Multicare's employee at the time of trial and that Multicare sought to designate her as its representative. Therefore, under ER 615, the trial court is without authority to exclude Barker from the courtroom.

Accordingly, we hold that the trial court abused its discretion when it denied Multicare's request to designate an employee who is also a fact witness in the case as its in-court representative under ER 615.

18

## B. MULTICARE'S PROPOSED JURY INSTRUCTION ON THE TAXABILITY OF PERSONAL INJURY AWARDS

Multicare also argues that the trial court erred when it refused to give a jury instruction regarding the taxability of personal injury awards and because its proposed instruction is a correct statement of law, the trial court erred when it refused to give it.[4] We hold that the trial court did not abuse its discretion when it refused to give the jury instruction on the taxability of personal injury awards.

We review the trial court's decision not to give a proposed jury instruction for an abuse of discretion. *Stiley v. Block*, 130 Wn.2d 486, 498, 925 P.2d 194 (1996). We review alleged errors of law in a jury instruction de novo. *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265, 22 P.3d 791 (2000). Jury instructions are appropriate where they permit the parties to argue their theories of the case, are not misleading to the jury, and properly inform the jury of the applicable law. *Cox*, 141 Wn.2d at 442.

In *Hinzman v. Palmanteer*, 81 Wn.2d 327, 333-35, 501 P.2d 1228 (1972), our Supreme Court upheld a trial court's refusal to give a jury instruction on the tax consequences of a personal injury award. In *Hinzman*, the parents of a seven-year-old girl, who died in a car accident, sued the car's driver, its owner, and the driver's employer for damages. 81 Wn.2d at 328. The defendants requested an instruction that the jury should deduct "reasonable income taxes," among other things from its award. *Hinzman*, 81 Wn.2d at 333. Our Supreme Court held that the trial court did not err when it refused to give the instruction and based its decision on three principles:

---

[4] Haskins argues that Multicare failed to preserve the jury instruction issue. But at trial, Multicare argued that its proposed jury instruction "deals with the non-taxability of a personal injury award." 5 RP (Jan. 29, 2013) at 184. Multicare stated, "We'll just take an exception to that and preserve the issue." 5 RP (Jan. 29, 2013) at 184. We hold that the issue was preserved.

(1) the plaintiff's tax liability is not pertinent to the issue of damages, (2) the amount of tax liability that may come due is too speculative, and (3) it might be confusing for the jury to introduce an income tax issue or question. *Hinzman*, 81 Wn.2d at 333-34. The court held that

> [w]here extremely high income is involved, injustice to a defendant from ignoring future taxes might outweigh injustice to a plaintiff from reducing an award of damages to allow for a speculative tax element. . . . There was no proof of extremely high prospective income in the instant case, and even if we were to depart from the majority rule, this does not present an appropriate case to do so.

*Hinzman*, 81 Wn.2d at 334.

In *Boeke v. International Paint Co. (California), Inc.*, Division One of this court, relying on *Hinzman*, refused to give an instruction that any award of damages would not be subject to federal income tax. 27 Wn. App. 611, 616-17, 620 P.2d 103 (1980), *review denied*, 95 Wn.2d 1004 (1981). In *Boeke*, Division One held that because the plaintiffs' income was not "'extremely high,'" as *Hinzman* requires, the income tax instruction was not warranted. 27 Wn. App. at 617 (quoting *Hinzman*, 81 Wn.2d at 334).

In *Janson v. North Valley Hospital*, the plaintiff, whose award was subject to federal income taxes, requested a jury instruction out of concern that the jury would think her award was nontaxable. 93 Wn. App. 892, 906, 971 P.2d 67 (1999). Division Three of this court considered a U.S. Supreme Court decision that permitted evidence of potential taxes on past and future earnings in federal court, *see Norfolk & Western Railroad Co. v. Liepelt*, 444 U.S. 490, 496-98, 100 S. Ct. 755, 62 L. Ed. 2d 689 (1980), and disagreed with its reasoning. *Janson*, 93 Wn. App. at 906. Division Three concluded that *Liepelt* assumed that jurors would wrongfully inflate or deflate awards based on inappropriate speculation on tax consequences. *Janson*, 93 Wn. App. at 906. The court reasoned that the opposite assumption is just as likely and that instructing the jury

on "'every conceivable matter as to which it should not misbehave or miscalculate'" would be unnecessarily confusing. *Janson*, 93 Wn. App. at 906 (quoting *Liepelt*, 444 U.S. at 503 (Blackmun, J., dissenting)). The *Janson* court held that the trial court erred in permitting an instruction on the tax consequences of the plaintiff's award because an instruction on taxes was likely to overcomplicate the matter for the jury. 93 Wn. App. at 906.

Multicare requested a jury instruction that stated, "Any award to plaintiff will not be subject to federal income tax, and therefore you should not add or subtract for such taxes in fixing the amount of any award." CP at 163. However, Haskins is not someone with an extremely high income like the *Hinzman* court envisioned. Her exact income is unclear from the record, but Haskins testified that she is permanently disabled and receives just $342 a month from Social Security. She also testified that since she was diagnosed with cervical cancer, she has been on Medicare and Medicaid. This is not the type of high-income plaintiff the *Hinzman* court envisioned whose award might be unjust to the defendant if taxes are not considered.

Accordingly, we hold that the trial court did not abuse its discretion when it declined to give Multicare's proposed jury instruction on the taxability of personal injury awards.

## CONCLUSION

We hold that (1) it was reversible error to fail to give Haskins's proposed res ipsa loquitur instruction, (2) it was not error to permit Multicare to present evidence of past collateral source payments, (3) it was an abuse of discretion to deny Multicare's request to designate an employee who is also a fact witness in the case as its in-court representative under ER 615, and (4) it was not an abuse of discretion to decline to give Multicare's proposed jury instruction on the taxability of

21

No. 44655-3-II

personal injury awards.  Accordingly, we vacate the judgment in Multicare's favor and remand for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
JOHANSON, C.J.

We concur:

_____
BJORGEN, J.

_____
MELNICK, J.

22